DISTRICT OF COLUMBIA HOUSING
AUTHORITY, Appellant,

v.

Donna PINKNEY, Personal Repre-
sentative of the Estate of Syl-
vester Whiting, Appellee.

No. 05–CV–1333.

District of Columbia Court of Appeals.

Argued April 15, 2008.
Decided May 7, 2009.

Frederick A. Douglas, with whom Hans Froelicher, IV, Acting General Counsel, District of Columbia Housing Authority, Margaret McFarland, and Nicole C. Mason, Washington, DC, were on the brief, for appellant.

Geoffrey P. Gitner, Washington, DC, for appellee.

Before FISHER and THOMPSON, Associate Judges, and NEBEKER, Senior Judge.

FISHER, Associate Judge:

Sylvester Whiting sued the District of Columbia Housing Authority ("DCHA") for personal injuries he suffered when he fell while stepping off of a malfunctioning elevator in a facility managed by DCHA. The jury rendered a verdict in his favor in the amount of $239,883.00. DCHA contends that we should vacate that judgment and instead enter judgment for DCHA, or grant it a new trial, because (1) it is protected by governmental immunity, (2) appellee failed to establish that DCHA had notice of a potential defect relating to misleveling incidents, (3) appellee failed to establish the applicable standard of care, (4) the trial court erred in instructing the jury on the theory of *res ipsa loquitur,* and (5) the verdict finding DCHA liable cannot stand because the same jury found DCHA's agent not to be liable. We affirm.

## I. Factual Summary[1]

In February 2002, Mr. Sylvester Whiting lived at the Arthur Capper Senior Center ("Capper Center"), a public housing facility operated by DCHA and located at 601 L Street, S.E., in the District of Columbia. The Capper Center consisted of approximately three hundred housing units. Seventy-five per cent of the residents were elderly and twenty-five per cent were disabled. Mr. Whiting was 77 years old at the time; he did not use a cane to walk.

On the evening of February 10, 2002, Mr. Whiting spent time in the Capper Center recreation room. When he left at approximately 7:30 p.m., Mr. Whiting boarded the nearest elevator, Elevator Number 2, on his way to his apartment on the second floor.[2] Due to problems with his heart, Mr. Whiting was unable to take the stairs.

When the elevator reached the second floor, it stopped and the door opened. Mr. Whiting had placed his left foot outside when the cab shook and the elevator moved so that there were "2 or 3 inches"

---

1. In light of our standard of review, we recount the facts in the light most favorable to appellee.

2. There were three elevators in the Capper Center: Elevator Number 1 was located at the front entrance, Elevator Number 2 was located near the recreation room, and Elevator Number 3 was not accessible from the first floor.

between the elevator and the floor. Mr. Whiting's right foot "got hung up in the door" and he tripped and fell forward. He landed on his right knee and remained in that position until the ambulance arrived. Mr. Whiting sustained a hip fracture and injuries to his knee that required him to use a walker and cane at all times and to take prescription pain medication.

DCHA had contracted with Quality Elevator to repair its elevators, and it monitored the status of the elevators by reviewing service tickets generated by Quality. These service tickets indicate that, prior to Mr. Whiting's fall, there were problems with Elevator Number 2's relays, which are sophisticated, multifaceted switches that help control an elevator's signals, its stopping points, and the opening of the elevator cab door. The service tickets also reported problems with Elevator Number 2's selector and commutator, which are additional components of the controller system. In August 2001, Quality Elevator found the controller systems "in poor condition" and, in a report to DCHA, recommended that "replacement should be budgeted for the near future." Nevertheless, Quality Elevator assured DCHA that it could keep the elevators running in their present condition even if they had outlasted their useful lives.

Although DCHA considered replacing the elevators, its five-year plan for that period did not contemplate upgrading them. The DCHA personnel responsible for making that decision were not aware that the controller system in Elevator Number 2 chronically malfunctioned.

## II. Procedural Background

On May 27, 2003, Mr. Whiting filed a complaint alleging that he was injured because DCHA had negligently maintained the elevators at the Capper Center. DCHA in turn filed a third-party complaint against Quality Elevator, its elevator service contractor. Thereafter, Mr. Whiting amended his complaint to add a claim against Quality Elevator. In May 2005, Mr. Whiting was replaced as plaintiff by his daughter, Donna Pinkney, the personal representative of his estate.

At the end of the seven-day trial, the jury returned a special verdict form finding that DCHA had knowledge of Elevator No. 2's mechanical problems. The jury found DCHA negligent and awarded the plaintiff $239,833.00. It also found that Quality Elevator was not negligent. Following the trial court's denial of DCHA's Motion for Judgment as a Matter of Law and/or New Trial, DCHA appealed to this court on November 3, 2005.

## III. DCHA Is Not Protected by Governmental Immunity

### A. The Doctrine of Governmental (or Sovereign) Immunity

 "The principles of sovereign immunity are well established in the District. Under this doctrine, the District is immune from suit in tort if the act complained of was committed in the exercise of a discretionary function. But where the District's conduct arises out of the exercise of ministerial powers, 'there is a duty to act in a reasonably safe and skillful manner.'" *District of Columbia v. Pace*, 498 A.2d 226, 228 (D.C.1985) (citations omitted); *see id.* at 228–30 (distinguishing the discretionary functions of planning and design from negligence in maintaining a structure, and holding that a suit involving the latter would not be barred by sovereign immunity);[3] *accord, Tucci v. District*

---

3. In light of this distinction between design and maintenance, appellant misplaces its reliance on *Baum v. United States,* although we acknowledge that some of the language in that opinion is superficially helpful to DCHA. In *Baum*—a decision not binding on this court—the Fourth Circuit stated that the deci-

*of Columbia,* 956 A.2d 684, 697 (D.C.2008) (The District is "protected by sovereign immunity if the [ ] acts [at issue] are discretionary, but subject to liability if the acts were ministerial in character.") (citation and punctuation omitted). "Generally, discretionary acts involve the formulation of policy, while ministerial acts involve the execution of policy." *Nealon v. District of Columbia,* 669 A.2d 685, 690 (D.C.1995).[4]

■ "The inquiry into whether an action is discretionary goes beyond whether the act entailed a choice among alternatives. It seeks to ascertain whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to ensure fearless, vigorous and effective decision making." *Casco Marina Development, L.L.C. v. District of Columbia Redevelopment Land Agency,* 834 A.2d 77, 81 (D.C.2003) (citation and internal punctuation omitted). In a roughly comparable situation involving the grounds of a public school, the United States Court of Appeals for the District of Columbia Circuit was "not persuaded ... that the function of repairing broken guardrails imposes upon the District determinations of such delicacy and difficulty that its ability to furnish public education

will be ponderably impaired by liability for neglect in failing to make such repairs." *Elgin v. District of Columbia,* 119 U.S.App. D.C. 116, 120–21, 337 F.2d 152, 156–57 (1964).

■ We review a trial court's determination regarding the applicability of sovereign immunity *de novo. Aguehounde v. District of Columbia,* 666 A.2d 443, 447 (D.C.1995) (whether sovereign immunity applies is "a determination to be made by the trial judge, not the jury, and this court conducts a *de novo* review of the trial court's determination") (citations omitted).

**B. DCHA's Decision to Keep the Capper Center Elevators Running**

■ DCHA contends that it made a budget-driven policy decision to maintain the Capper Center's elevators, rather than replace them, and that this choice was a discretionary function immunized from tort liability. More specifically, DCHA argues that: (1) "a governmental entity is entitled to absolute immunity for its discretionary decisions relating to the allocation of resources"; (2) DCHA evaluated needs and weighed priorities in determining how to

---

sion of when to "replace a major element of a substantial public facility" should be treated as a discretionary function. *Baum v. United States,* 986 F.2d 716, 724 (4th Cir.1993) (deciding the case "[i]n light of the nature" of the plaintiffs' maintenance argument and concluding that, "[w]hile we do not suggest that every maintenance decision of every government actor is so policy-based as to fall within the discretionary function exception, on the facts of this case we should reach no other result."). In *Baum,* the controversy centered on whether guardrail posts should have been made of cast steel, rather than cast iron. Importantly, there was "no suggestion of deterioration of the posts, the argument goes that they should not have been used in the first place. Thus, there is really no question as to maintenance[;] the fault, if any, was in design and construction." *Id.* at 723 n. 3.

Thus, in *Baum,* unlike in the instant case, allegedly faulty maintenance was not truly at issue.

4. DCHA is "a corporate body" with "a legal existence separate from the District government." D.C.Code § 6–202(a) (2008 repl. vol.). It may "[s]ue and be sued in its own name[.]" *Id.* § 6–203(11). Moreover, "[t]he District government ... shall not be liable for damages for any action, or failure to take action, by the Authority or its officers, employees, or agents." *Id.* § 6–205(d). Nevertheless, DCHA assumes that it is entitled to sovereign immunity for discretionary functions, and appellee does not argue to the contrary. Given our resolution of this case, we do not reach the question of whether DCHA is entitled to the protections of sovereign immunity in other circumstances.

spend its budget; and (3) in light of its annual capital improvements budget of $20 million, DCHA was "fiscally unable" to address all of the needs of its facilities, which would have cost $200 million.[5] We reject appellant's claim to discretionary-function immunity.

In November 2001, DCHA received a HOPE VI award from HUD to replace the Capper Center. In light of this good news, DCHA decided that it would not undertake "major rehabilitation in that community. We would only spend dollars to make sure that the building remains viable for the period leading up to the demolition." It would cost between $125,000 and $150,000 to replace each elevator in the Capper Center. Several projects—including replacement of the elevators—were "suspended." Demolition of the Capper Center was completed on December 26, 2007.

At trial, Christopher Arthur Stennett, the Director of Development and Modernization for DCHA, explained that, although no money would be spent on "capital improvements" at the Capper Center, the DCHA would "[m]ost definitely" still meet the critical and emergency needs of the residents. No "policy decision" was made

barring repairs and, if the elevators were unsafe, DCHA "would make them safe, most definitely." The budgeting process did not create any exception to DCHA's mandate to provide safe dwellings. "In no condition" would DCHA "leave residents in a building where it's unsafe." While there were "discussions along the line of replacing the elevators," no one had ever informed Mr. Stennett that Quality Elevator had found that the Capper Center elevators had outlasted their useful lives. The person DCHA assigned to monitor the contract with Quality Elevator did not bring issues of "maintenance or ongoing repair" to Mr. Stennett's attention.[6] Stennett had "heard of cosmetic issues, but not chronic problems."

## C. Elevator Maintenance is a Ministerial Activity

█ Seeking to establish that it made a discretionary decision, DCHA cites *Chandler v. District of Columbia,* 404 A.2d 964 (D.C.1979), for the proposition that we "consider[ ] financial factors as valid evidence of policy/discretionary decision-making." That case is readily distinguishable, however. In *Chandler,* a mother sued the

---

5. DCHA received its funding for improvement projects, including replacing elevators, from the United States Department of Housing and Urban Development ("HUD"). Every five years, DCHA sought the input of facility maintenance departments and outside consultants to determine whether its facilities needed capital improvement. DCHA officials estimated the costs of correcting deficiencies in the various buildings (which amounted to approximately $200 million for the period in question), took into account the annual capital improvement budget provided by HUD (approximately $20 million), and created a spending plan designed to address the most critical needs. DCHA ranked each facility's needs and submitted a five-year plan to HUD for its consideration. The DCHA's five-year plan for the Capper Center for the period

including February 2002 did not contemplate upgrading the elevators.

6. Denying DCHA's pretrial motion to dismiss, the court noted that the deposition testimony of Steven Firth "does not support defendant DCHA's contention that it enacted a policy that precluded overhauling or repairing the elevators in plaintiff's building." Mr. Firth, the Facilities Director for the Anacostia region, stated that the Housing Authority made a decision sometime in 2002 that "no major work" was to be done on the Capper Center "[u]nless it is a situation that is life-threatening or needed to be done, absolutely needed to be done for safety reasons...." Mr. Firth acknowledged that DCHA did replace the generator system "because it was old, but that is a life safety issue. And we did go out and put that money in. It was necessary."

District after her two children died in a fire.

Prior to that time the District, for financial reasons, had instituted a program closing a number of fire stations on a random, rotating basis. Appellant alleged that on the day of the fire the station nearest her home was closed pursuant to this program; that this closure constituted negligence on the part of the District, its agents and instrumentalities; and, that the closure was the direct and proximate cause of the deaths of the two children.

*Id.* at 965. The plaintiff admitted, however, "that the action she allege[d] to have been negligent, *viz.,* the decision regarding the fire station closure program, was 'discretionary.'" *Id.* In other words, she "concede[d] that the station closure program was an action taken by government decision-makers who were prompted by policy considerations. . . ." *Id.* at 966. Under these circumstances, we held, in accordance with settled case law, that the District was protected by sovereign immunity.[7] Here, by contrast, appellee vigorously asserts that the decisions made by DCHA were not discretionary in nature, and that assessment is certainly supported by this record.

DCHA's statutory mandate requires it to "be responsible for providing decent, safe, and sanitary dwellings, and related facilities, for persons and families of low- and moderate-income in the District." D.C.Code § 6–202(b) (2008 repl. vol.). This no doubt is a challenging mission in the face of budgetary constraints, and we understand why DCHA did not want to make expensive capital improvements in a building that soon would be demolished. But if DCHA could not afford to replace the elevators, and could not make them safe through less costly measures, it had the options to shut them down or relocate the residents.

Nevertheless, DCHA did not opt to place an "out of order" sign on the door of Elevator Number 2, leaving the residents to rely upon the other two elevators. By providing elevator service for the residents of the Capper Center, DCHA assumed a duty to use reasonable care. We held in *Wagshal v. District of Columbia* that "[t]he District need not have put up the [stop] sign, but once it did, it had a duty to maintain it properly in order to keep the intersection reasonably safe for motorists." 216 A.2d 172, 174 (D.C.1966). Similarly here, having decided to keep Elevator Number 2 in service, DCHA had a duty to keep it operating in a reasonably safe manner. The cost and burden of making repairs remained relevant to the issue of negligence,[8] but the budgetary constraints

7. Our decision in *Chandler* was also influenced by the "public duty doctrine," the principle that "the provision of or failure to provide services does not define a duty of care" to individual members of the public at large. *Id.* at 966. We acknowledged, however, that "when a special relationship develops between an agent of the government and a private individual, a duty of care may be found." *Id.* at 967. "Similarly, when services are provided for private use, liability may ensue from injury to the private user." *Id. Chandler* thus provides little help to DCHA because Mr. Whiting was not simply a member of the public at large, but rather a tenant in a DCHA facility.

8. The trial court instructed the jury that:

The law does not require the landlord to guarantee the safety of persons using the common areas. The law also does not require the landlord to undertake unreasonable burdens to maintain the premises in a safe condition. . . . In considering whether the landowner acted reasonably, you should consider the likelihood that the landowner's conduct would cause harm, the seriousness of the harm if it happened, and the cost or burden on the landowner to reduce or eliminate the risk of the harm.

cited here did not, without more, entitle DCHA to sovereign immunity.

Perhaps the most convincing point in appellee's favor is DCHA's failure to prove that it actually made a policy decision based on budgetary constraints. The testimony demonstrated that the DCHA authorities charged with making budgetary decisions in 2001 were not even aware that the Capper Center elevators were chronically malfunctioning and trapping elderly residents between floors. Appellant's own witnesses, officials responsible for establishing DCHA's budget, testified that if they had known that the elevators were unsafe, DCHA would have allocated money for repairs to keep the premises safe for its residents. Given the record before us, we agree with the trial court that the "maintenance of elevators in a residence facility over which [the governmental entity] has responsibility" is not a discretionary function that qualifies for sovereign immunity. To paraphrase the decision in *Elgin,* we are "not persuaded ... that the function of repairing [elevators] imposes upon [DCHA] determinations of such delicacy and difficulty that its ability to furnish public [housing] will be ponderably impaired by liability for neglect in failing to make such repairs." *Elgin,* 119 U.S.App.D.C. at 120–21, 337 F.2d at 156–57.

## IV. DCHA Had Notice of a Dangerous Condition

The jury unanimously answered "yes" to this question on the special verdict form: "Do you find that the District of Columbia Housing Authority had actual or constructive notice of a misleveling problem with elevator number 2 at the Arthur Capper Senior Center before February 10, 2002?" Appellant argues that there is insufficient evidence to support that conclusion, but we disagree.

■■ "We review [a decision granting or denying] a motion for judgment as a matter of law by applying the same standard as the trial court." *Majeska v. District of Columbia,* 812 A.2d 948, 950 (D.C. 2002). "A trial court may grant a motion for judgment as a matter of law notwithstanding the verdict only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor." *Liu v. Allen,* 894 A.2d 453, 459 n. 10 (D.C.2006).

### A. The Requirement of Notice

■ "The law ... requires ... that the landlord have notice, actual or constructive, of a hazardous condition; without such notice, the landlord is not liable for any resulting injuries." *Youssef v. 3636 Corp.,* 777 A.2d 787, 794 (D.C.2001). This requirement applies to government defendants as well. *See Miller v. District of Columbia,* 343 A.2d 278, 280 (D.C.1975) ("in all negligence actions against the District, proof of actual or constructive notice of the defect which caused the injury is a necessary predicate to its liability"); *Hackett v. District of Columbia,* 264 A.2d 298, 300 (D.C.1970) ("In the absence of proof of notice of the defective condition, liability for negligence cannot be imposed on the District."). "In order to support a finding of constructive notice of a hazard, the cause of the injury must be foreseeable ... and the cause must have been present in the area where the injury occurred for a sufficient length of time that the property owner should have known about it." *Marinopoliski v. Irish,* 445 A.2d 339, 341 (D.C. 1982) (citations omitted); *accord, Lynn v. District of Columbia,* 734 A.2d 168, 171 (D.C.1999).

### B. The Evidence at Trial

■ Several witnesses from DCHA knew there were problems with the Capper Center elevators. Ms. Rhonda Har-

vell, Housing Manager of the Capper Center at the time of Mr. Whiting's fall, was aware that elevator cars stopped between floors on many occasions before (and after) Mr. Whiting's injury. Ms. Harvell further testified that Quality Elevator submitted service tickets to DCHA, and that she and her foreman signed off on these service tickets and kept them in a "building contract notebook." Those service tickets documented a number of instances in which Quality Elevator addressed problems with Elevator Number 2's relays, selector, and control system. Appellee presented expert testimony that a defective controller system could lead to problems with "leveling and leveling patterns," which could cause the elevator to make an erratic motion.[9]

A DCHA security officer who was stationed at the Capper Center testified that people have gotten stuck in the elevators "sometimes twice in one day" and that "quite often" the malfunctioning elevator was Elevator Number 2. The parties also introduced evidence that the Capper Center residents were elderly and/or disabled, and that some residents used walkers or wheelchairs.

Mr. Richard Jackson, who was assigned to monitor DCHA's contract with Quality Elevator, knew that residents got stuck in the elevators at the Capper Center and that service tickets revealed problems with the controller system and the relays. In December 2001, he received a report from Quality Elevator which stated: "The controllers are in poor condition and replacement should be budgeted for the near future."

Although Elevator Number 2 may not previously have misleveled in precisely the way it did on February 10, 2002, the evidence, viewed in the light most favorable to appellee, supported the jury's finding that DCHA had notice of a problem with Elevator Number 2's relays, selector, and control system. The evidence presented at trial—including some testimony provided by defense witnesses—also demonstrated that such defects could cause misleveling. Consequently, there was sufficient evidence that DCHA had notice that Elevator Number 2 could malfunction and cause an injury such as the one suffered by Mr. Whiting.

## V. The Standard of Care

### A. Expert Testimony

In order to establish negligence, a plaintiff must demonstrate the violation of a nationally recognized standard of care. "[T]he plaintiff must prove the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Evans–Reid v. District of Columbia*, 930 A.2d 930, 937 n. 6 (D.C.2007) (citations and internal punctuation omitted); *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C.2003).

At trial appellee introduced the testimony of James Coaker, an expert in elevator safety, maintenance, and inspection. He testified that in order to comply with American Society of Mechanical Engineers ("ASME") Code A–17.1, "when the door reaches its full open position, there is a

---

9. DCHA places heavy reliance on *Hafferman v. Westinghouse Electric Corp.*, 653 F.Supp. 423 (D.D.C.1986), a case involving misleveling of a service elevator. There, the district court granted summary judgment for the defendant hotel, noting "that the elevator in question had misleveled only once before and that misleveling had been corrected a month

prior to the alleged accident." *Id.* at 432. Here, there was a long history of problems with the controller system and its sub-parts, the commutator, selector, and relays. Moreover, *Hafferman* is not binding on us, and we do not find it sufficiently persuasive to require that we overturn the jury's verdict in this case.

very distinct code requirement that the floor of the car and the landing at which that car has arrived shall be 'substantially level.'" Although the "substantially level" requirement is not quantified in the ASME provision, "the standard in the industry ... [would not] permit any elevator company, any owner of any building that has an elevator in it to operate their elevator so that it does not level with the hallway floor and that it can deviate between 2 to 4 inches[.]"

In addition to inspecting the elevator, Mr. Coaker examined the service tickets issued by Quality Elevator and Collins Elevator (Quality Elevator's predecessor) and concluded that "[t]he handwriting was on the wall that the system age, its condition and level of degradation had gotten to a point where, in my mind, there was concern about the continuity of operation." Mr. Coaker also testified that the system was defective at the time of Mr. Whiting's accident, and this defect caused him "a deep concern for safe operation." Given the state of the controller system on February 10, 2002, it was reasonably foreseeable that the elevator could mislevel. "[I]t was a problem waiting to happen. What we couldn't predict is how it would manifest itself."

When asked to give specific instances, based on his "review of the service record for this elevator[,] ... of the types of things that happened to Elevator Number 2 because of the controller system being defective," Mr. Coaker responded: "Certainly leveling and leveling patterns are an issue; car performance, the car stopping

without apparent reason between floors ...; erratic control behavior as a car, as we said, leveling or into the slow down mode." He opined that the failure of the elevator's leveling function led to the erratic motion that caused Mr. Whiting to fall. "In reality, given the age and condition of the equipment, [he thought] the only rational mechanism to have assured a reasonable level of safety would have been either a major renovation or replacement of the equipment in total." Replacement of the controller system would not have guaranteed there would never be a problem, but "the propensity of the malfunction ... would have been statistically far less"; there would have been "less than [a] 1 or 2 percent chance ... that a leveling problem would have occurred."

## B. Appellee Sufficiently Established the Standard of Care

DCHA argues that Mr. Coaker did not sufficiently articulate the standard of care because he did not describe a standard "followed by comparable governmental entities or some standard nationally recognized by housing authorities funded by HUD." DCHA asserts, in other words, that appellee should have been required to present "expert testimony that pertained to the maintenance and replacement of municipally owned elevators."[10] We decline to require plaintiffs to establish such a particularized standard of care.

From time to time we have said that an "expert must clearly relate the standard of care to the practices in fact generally followed by other comparable

10. Appellant asserts that the lack of evidence of a standard of care was highlighted by the instruction that, "[i]n considering whether the landowner acted reasonably, you should consider ... the cost or burden on the landowner to reduce or eliminate the risk of harm." According to appellant, this instruction "impermissibly allowed jury speculation and second-guessing with regard to DCHA's discre-

tionary decisions regarding the expenditure of funds for capital improvements to DCHA owned properties." We disagree. As discussed above, the jury was being asked to determine whether DCHA negligently carried out a ministerial function. The trial court did not abuse its broad discretion in fashioning jury instructions, and it did not misstate the law of negligence.

governmental facilities or to some standard nationally recognized by such units." *Clark v. District of Columbia,* 708 A.2d 632, 635 (D.C.1997). But these cases involved functions that were quintessentially governmental. *See, e.g., Evans–Reid,* 930 A.2d at 936 (police use of deadly force while conducting investigatory traffic stop); *District of Columbia v. Arnold & Porter,* 756 A.2d 427, 434 (D.C.2000) (operation and maintenance of a municipal water main system); *Clark,* 708 A.2d at 635 (case involving juvenile who committed suicide while in custody of District of Columbia at juvenile center). Here, DCHA has not persuaded us that elevators in public housing facilities should be treated differently from elevators in privately-owned apartment buildings. "In the District of Columbia the applicable standard for determining whether an owner or occupier of land has exercised the proper level of care to a person lawfully upon his premises is reasonable care under all of the circumstances." *Sandoe v. Lefta Associates,* 559 A.2d 732, 738 (D.C.1988). Viewed, as it should be, in the light most favorable to the plaintiff, *see Snyder v. George Washington University,* 890 A.2d 237, 245 (D.C. 2006), Mr. Coaker's testimony was adequate to establish the applicable standard of care.

## VI. The Trial Court Did Not Err by Instructing the Jury on *Res Ipsa Loquitur*

DCHA argues that it was error to instruct the jury on the doctrine of *res ipsa loquitur* because: (1) appellee failed to exclude "other possible causes" of Mr. Whiting's accident, (2) appellee presented evidence of specific acts of negligence, and (3) expert testimony was required to resolve complex issues of fact. DCHA does not challenge the wording of the instruction, just the fact that it was given.[11]

### A. Standard of Review

"A party is entitled to an instruction on his or her theory of the case if the [requested] instruction is supported by the evidence." *Nelson v. McCreary,* 694 A.2d 897, 901 (D.C.1997) (citing *Nimetz v. Cappadona,* 596 A.2d 603, 605 (D.C.1991)). The "trial court has broad discretion in fashioning appropriate jury instructions," but that "discretion does not extend to refusal to charge on a party's theory of the case." *Nelson,* 694 A.2d at 901 (citations and punctuation omitted).

"To make out a prima facie case under a *res ipsa loquitur* theory, the plaintiff must present sufficient evidence to establish three elements: (1) The event must be of the kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the control (exclusive or joint) of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." *Otis Elevator Co. v. Henderson,* 514 A.2d 784, 785 (D.C.1986). "Once the plaintiff has established these elements,

---

11. The trial court gave the following instructions to the jury: "You may conclude from the mere fact that an accident happened that the defendant was negligent if you find three things: First, that the accident was of the kind that ordinarily does not occur unless someone is negligent; second, that the cause of the accident was within the defendants' exclusive control; and third, that the accident was not due to any voluntary actions or contribution by the plaintiff. If you can find that all three of these requirements have been established by a preponderance of the evidence, then you may conclude that the defendant was negligent." The trial court further instructed: "The mere happening of an accident does not mean that any party to this action was negligent." The jury found that Mr. Whiting was not contributorily negligent.

the case may be submitted to the jury, which still must determine whether all of the elements necessary for a finding of negligence are present." *Id.* We have observed that "[e]levator (and escalator) accident cases are perhaps the paradigm application of *res ipsa loquitur.*" *Twyman v. Johnson,* 655 A.2d 850, 853 (D.C.1995) (citations omitted).

## B. Appellee Was Not Required to Exclude All Other Possible Causes of Mr. Whiting's Injury

 "It has been said that 'ordinarily' is the key concept of res ipsa loquitur." *Quin v. George Washington University,* 407 A.2d 580, 583 (D.C.1979). "At the threshold, plaintiff must demonstrate that the injury ordinarily does not occur when due care is exercised.... There must be a basis in the record or in common experience to warrant the inference." *Id.* (citations omitted). In this case, the basis for the inference was furnished in part by common experience or understanding and in part by expert testimony.

 A common understanding that there has been neglect (or an absence of due care) in maintaining an elevator may exist where the "elevator exhibits some clearly unusual action or movement," *Hailey v. Otis Elevator Co.,* 636 A.2d 426, 428 (D.C.1994), as happened in this case. Ap-

pellee's expert witness, Mr. Coaker, also helped to explain why Elevator Number 2 malfunctioned on February 10, 2002. To be sure, he did not testify that elevators would never malfunction in the absence of negligence.[12] But, as we have seen, "ordinarily," as opposed to "never," is the key concept.

Contrary to appellant's assertion, the chance that misleveling might occur even if the parts were replaced does not render the doctrine of *res ipsa loquitur* inapplicable. There was no doubt that the elevator, not an outside force, had caused the injury.[13] The question was whether the elevator malfunctioned due to negligence. *See Otis Elevator Co. v. Henderson,* 514 A.2d at 785 (Where "any one or more of a number of specific mechanical defects could have led to" the problem and "[a]bsent conclusive evidence of a specific defect ... Henderson was entitled to have the jury instructed on *res ipsa loquitur* and negligence."). Mr. Coaker testified that the chances of a misleveling incident could have been dramatically reduced by renovation or replacement. Nothing in his testimony prevented the trial court from issuing an instruction on *res ipsa loquitur* or the jury from concluding "that the accident was of the kind that ordinarily does not occur unless someone is negligent[.]" See note 11, *supra.*[14]

12. Mr. Coaker said that "[r]eplacement of the controller system ... would not guarantee that nothing could go wrong or would go wrong ever. However, the propensity of the malfunction of the control system as we have seen had the controller and control mechanisms been replaced would have been statistically far less." He elaborated that there would be "less than [a] 1 or 2 percent chance with a new control system, once it's in place and adjusted, that a leveling problem would have occurred."

13. As noted above, the jury found that Mr. Whiting was not guilty of contributory negligence.

14. In *Hafferman v. Westinghouse Electric Corp.,* 653 F.Supp. 423 (D.D.C.1986), the district court concluded that the record had "destroy[ed] any res ipsa inference that could be drawn." *Id.* at 433. It appears that the record in our case demonstrates a more lengthy history of elevator malfunctions. Most importantly, the decision in *Hafferman* is not binding on us, and we do not find it sufficiently comparable or persuasive to compel the conclusion that it was improper to instruct the jury in this case on the doctrine of *res ipsa loquitur.*

## C. Appellee's Presentation of Expert Testimony and Proof of Specific Acts of Negligence Did Not Bar It From Invoking the Doctrine of *Res Ipsa Loquitur*

"[I]t is quite generally agreed that the introduction of some evidence which tends to show specific acts of negligence on the part of the defendant, but which does not purport to furnish a full and complete explanation of the occurrence does not destroy the inferences which are consistent with the evidence, and so does not deprive the plaintiff of the benefit of res ipsa loquitur." *Sullivan v. Snyder*, 374 A.2d 866, 867 n. 1 (D.C.1977) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 40, at 232 (4th ed. 1971)). In other words, "[t]his court permits the plaintiff in a proper case to rely upon both res ipsa loquitur and proof of specific acts of negligence." *Quin*, 407 A.2d at 582. Moreover, presentation of expert testimony is not incompatible with the *res ipsa* doctrine. Indeed, when the facts are complicated, such as in medical malpractice cases, we generally *require* the plaintiff to produce expert testimony to lay the foundation for invoking *res ipsa loquitur. See Quin*, 407 A.2d at 583; *Harris v. Cafritz Memorial Hospital*, 364 A.2d 135, 137 (D.C.1976).

"*Res ipsa loquitur* becomes irrelevant only when the manner in which the defendant was allegedly negligent is 'completely elucidated' . . . and 'there is nothing left for the jury to infer regarding the cause of the accident.' " *Gubbins v. Hurson*, 885 A.2d 269, 283–84 (D.C.2005) (citations omitted). Mr. Coaker's testimony did not make the cause of Mr. Whiting's fall that clear. In fact, he conceded that he had not "identified with any reasonable degree of certainty the specific part of the leveling function that failed. . . ." This branch of appellant's argument is also without merit.

## VII. The Jury's Findings Regarding Negligence Are Not Legally Inconsistent

### A. The Jury's Verdicts

The jury found "that the District of Columbia Housing Authority was negligent in its maintenance of elevator number 2 at the Arthur Capper Senior Center prior to February 10, 2002, and that its negligence was a proximate cause of plaintiff's accident." It then answered "No" to the third question presented: "Do you find that Quality Elevator Company, Incorporated, was negligent in its maintenance of elevator number 2 at the Arthur Capper Senior Center prior to February 10, 2002, and that its negligence was a proximate cause of the plaintiff's accident?" DCHA argues that there was no evidence that it was negligent in hiring, supervising, or retaining Quality Elevator and that consequently these verdicts are inconsistent. It asserts that "DCHA could not have been determined to be negligent as a principal when its agent, Quality Elevator, was found not negligent."

### B. Waiver

DCHA did not raise an objection based on inconsistent verdicts before the jury was excused, and it therefore has waived this argument. As the commentary explains, Superior Court Civil Rule 49 countenances a waiver of objections to inconsistencies in the verdict that are not pointed out before the jury is discharged. *Estate of Underwood v. National Credit Union Admin.*, App. D.C., 665 A.2d 621 (1995). Subdivision (b) of this Rule evidences an important principle of judicial economy: there is good reason, in a case of inconsistent verdicts, to require an affected party to advise the court of the problem immediately and to ask that the jury be directed to correct the problem before it is discharged; otherwise, the affected party

risks waiver of the inconsistency argument as a ground for a new trial. *Estate of Underwood v. National Credit Union Admin.*, App. D.C., 665 A.2d 621 (1995). Super. Ct. Civ. R. 49, cmt. However, we need not rely on waiver alone because DCHA has failed to establish that the verdicts were inconsistent.

## C. The Verdicts Were Not Inconsistent

■ In its order denying DCHA's motion for judgment as a matter of law, the trial court determined that the verdicts were "not inconsistent on the facts which the jury could have properly found. For example, it could have found that DCHA as the landowner had the duty encompassed by Instruction 10-3,[15] which it failed to perform adequately resulting in Mr. Whiting's injury, and/or that it had been warned of the poor condition of the elevators at the Capper Center by Quality Elevator, its elevator contractor, and did not correct the defect(s) it had been warned about. On these facts, it would not have been unreasonable for the jury to come to such conclusions." We agree.

■ During trial, appellee argued to the jury that a "landowner has a duty to perform such inspections as a reasonable person would find necessary to detect or learn about any dangerous condition" and

that this duty is nondelegable and "is not changed by the employment of an independent contractor." Appellee presented additional arguments that would apply to DCHA, but not to Quality Elevator, including: in fulfilling its duty as a landowner, DCHA had to take into account that the residents of the Capper Center were elderly and disabled; that a landlord has a duty to warn residents of the existence of a dangerous condition; and that when Quality Elevator "told the District that the control system should be replaced" and that "the elevators have outlasted their useful life," DCHA had a responsibility to take the elevators out of operation or otherwise reasonably address the safety needs of its residents. DCHA has failed to establish that no reasonable jury presented with this record and these arguments could have found that DCHA was negligent but Quality Elevator was not.[16]

## VIII. Conclusion

In sum, DCHA has not demonstrated that the proof was deficient or that reversible error occurred. The judgment of the Superior Court is hereby

*Affirmed.*

---

15. Standard Civil Instruction 10-3 explains that a landowner has the "duty to perform such inspections as a reasonable person would find necessary to detect or learn about any dangerous condition." Standardized Civil Jury Instructions for the District of Columbia, No. 10-3 (2002).

16. DCHA also contends in the final footnote of its brief that "[t]he trial was infected with other errors," including misconduct in closing argument, but we deem these claims to be

abandoned. These "other errors" are not included in the statement of issues presented, nor has DCHA identified parts of the record that demonstrate such errors occurred. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Wagner v. Georgetown University Medical Center*, 768 A.2d 546, 554 n. 9 (D.C.2001) (citations omitted); *see also Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993).