*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-981

ANTHONY JONES, APPELLANT,

V.

NYLIFE REAL ESTATE HOLDINGS, LLC, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-69-18)

(Hon. William M. Jackson, Trial Judge)

(Argued April 21, 2021                              Decided June 17, 2021)

*Jerry Spitz*, with whom *Adam Rosen* was on the brief, for appellant.

*Kenneth G. Stallard*, with whom *K. Maxwell Bernas* was on the brief, for appellees REEP-OFC Westory DC LLC and Carr Services Subsidiary Corporation.

*Rebecca L. Dannenberg*, with whom *Landon S. Moyer* was on the brief, for appellee C.A. Lindman, Inc.

Before GLICKMAN and THOMPSON, *Associate Judges*, and RUIZ, *Senior Judge*.

THOMPSON, *Associate Judge*: Appellant Anthony Jones was injured after being struck in the head by a metal-encased pilaster (sometimes referred to in the record as the "metal trim" or "trim") that fell off the wall in the main lobby of the office building where he worked ("the Westory"). Mr. Jones filed a negligence

action against several defendants, including appellees REEP-OFC Westory DC LLC ("REEP"), Carr Services Subsidiary Corporation ("Carr"), and C.A. Lindman, Inc. ("Lindman").[1] The trial court granted summary judgment in favor of appellees, finding, on a summary judgment record that included extensive deposition testimony, that Mr. Jones failed to establish that defendants had actual or constructive notice of, and a duty to prevent the risk of injury from, the pilaster's hazardous condition. In this appeal, Mr. Jones argues that the trial court reached that conclusion only because it failed, erroneously, to review the record in the light most favorable to him. The trial court also held that the doctrine of *res ipsa loquitur* was inapplicable and therefore did not assist Mr. Jones in meeting his burden of proof. Mr. Jones contends that this ruling, too, was erroneous and that the record satisfied all the elements required for application of *res ipsa loquitur*.

For the reasons that follow, we affirm the trial court's grant of summary judgment in favor of defendants/appellees.

---

[1] Although the name of NYLife Real Estate Holdings, LLC ("NY Life") appears in the caption, Mr. Jones does not argue that summary judgment was erroneously entered in favor of NYLife. The Superior Court found that NYLife had no ownership interest in the Westory and owed no duty to Mr. Jones.

## I. Facts

Mr. Jones was struck by the pilaster on January 8, 2015, as he was walking through the interior lobby of the Westory on his way to work. The pilasters were installed before REEP, the record sole owner of the building and a subsidiary of former defendant NY Life, acquired the building in 2012. Upon acquiring the Westory, REEP retained engineering firm Pond Robinson & Associates, LP ("Pond Robinson") to perform an assessment of the condition of the building. Pond Robinson's report cited no safety issues with the (several) pilasters in the Westory lobby. In 2012, REEP also contracted with Carr to manage the Westory. Carr in turn contracted with Lindman to perform façade cleaning, repair, and restoration work on the exterior of the building from April 2014 to June 2015. Lindman erected scaffolding around the building and used various tools, including grinders and chipping hammers, to perform this work.

On January 4, 2018, Mr. Jones filed his complaint for injuries sustained as a result of the incident. Appellees moved for summary judgment and, on July 12, 2018, the trial court, in two separate orders, granted appellees' motion on all claims. With respect to REEP and Carr, the trial court found that appellant failed

to establish that either had actual or constructive notice that the pilaster was not securely affixed and that the adhesive holding it on the wall might fail. The court also found that the doctrine of *res ipsa loquitur* was inapplicable given that there was a complete explanation of the incident and its cause. As to Lindman, the court found that it owed no duty to appellant because Lindman was not obligated to inspect the interior of the building and because appellant failed to establish that Lindman had actual or constructive notice of the pilaster's hazardous condition.

Mr. Jones contends that the evidence, viewed in the light most favorable to him, provides an ample basis "for a jury to reasonably find that [appellees] had constructive notice of the dangerous condition of the . . . pilaster." As to the court's res ipsa loquitur ruling, Mr. Jones contends that the trial court "failed to consider that the cause of the pilaster falling on that specific day    . . . is unknown."

## II. Standard of Review

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Tolu v. Ayodeji*, 945 A.2d 596, 600 (D.C. 2008) (ellipsis omitted). The moving party has the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law." *Id.* If the movant meets his or her burden, "[t]he burden then shifts to the non-moving party to present evidence showing the existence of genuine issues of material fact." *Id.* A court resolving a summary judgment motion must view the evidence in the light most favorable to the party opposing the motion, "and that party is entitled to all favorable inferences which may reasonably be drawn from the evidentiary materials." *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C. 1991).

A moving "defendant's initial showing can be made by pointing out that there is a lack of evidence to support the plaintiff's case." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). The non-moving plaintiff then "may not rely on conclusory allegations or denials but must set forth specific facts showing

that there is a genuine issue for trial. *Tolu*, 945 A.2d at 600. "To satisfy [its] burden, the non-moving party must show more than a 'metaphysical doubt' or a 'scintilla of evidence.'" *Gilbert v. Miodovnik*, 990 A.2d 983, 988 (D.C. 2010). "There must be some significant probative evidence tending to support the complaint so that a reasonable fact-finder could return a verdict for the non-moving party." *Id.*

We review a trial court's grant of summary judgment *de novo* and apply the same standard as the trial court was required to apply. *Reeves*, 135 A.3d at 811. We consider whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id*.

"[A] person is liable to another in negligence only if it can be shown that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1097-98 (D.C. 1994). Thus, "it is critical to determine whether a duty was owed by the alleged tortfeasor to the person claiming injury." *Id.* at 1098. "[T]o determine whether the defendant owed a duty to the claimant in a negligence action," courts generally rely on the concept

of foreseeability, "examin[ing] whether the risk to the claimant was 'reasonably foreseeable' to the defendant." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (en banc). If the injury to the plaintiff "was not 'reasonably foreseeable' [to the defendant], then there was no duty." *Id*.

In a case alleging negligence in the maintenance of a building, grounds, or other location, to establish the requisite duty, the plaintiff must also show that the defendant either knew or should have known – i.e., had constructive notice – of the hazardous condition creating a foreseeable risk of injury. *See Marinopoliski v. Irish*, 445 A.2d 339, 341 (D.C. 1982) ("[T]he cause of the injury must be foreseeable . . . and the cause must have been present in the area where the injury occurred for a sufficient length of time that the property owner should have known about it."). To prove constructive notice, "a plaintiff must present evidence that a dangerous condition existed for such a duration of time that had reasonable care been exercised[,] the hazard would have been discovered." *Wilson v. Washington Metro. Area Transit Auth.*, 912 A.2d 1186, 1190 (D.C. 2006). "The relevant circumstances that a court may consider include such things as the length of time that the defective condition existed" and "whether the condition was obvious or latent." *Briscoe v. District of Columbia*, 62 A.3d 1275, 1279 (D.C. 2013). "[T]he fact that a defect exists is not sufficient in and of itself to provide

constructive notice of that defect to the entity that maintains the property." *Washington Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375, 378 (D.C. 2009).

## III. Analysis

## A. Constructive Notice

The issue in this case is whether, on the record presented, a reasonable factfinder could determine that the appellees had constructive notice of the dangerous condition of the pilaster and therefore owed a duty to Mr. Jones. *See Marinopoliski*, 445 A.2d at 340 ("To create a jury question in a negligence case, the plaintiff must produce evidence from which a reasonable juror may conclude that a certain hazard caused the injury *and* that the defendant had actual or constructive notice of that hazard."). To answer that question, we must examine whether the record evidence — with all inferences drawn in favor of Mr. Jones — shows a genuine dispute about notice.

### 1. REEP & Carr

With regards to the record evidence relevant to appellees REEP and Carr, Mr. Jones argues that there were four pieces of evidence that jurors could rely on to find that defendants had constructive notice of the dangerous condition of the pilaster. We agree with the trial court that the evidence to which Mr. Jones points does not create a genuine dispute regarding the issue of constructive notice. Whether taken singly or considered all together, the evidence viewed in the light most favorable to Mr. Jones would not permit a jury reasonably to find that the pilaster's detaching from the wall and striking him was reasonably foreseeable to appellees.

Multiple witnesses for Carr (Senior Property Manager Ellen King, building engineer Robbie Ravan, and Chief Engineer Kevin Corsillo) testified that they did not know before the incident that the pilaster was affixed to the Westory's lobby wall with adhesives and without mechanical fasteners.[2] Mr. Jones, however,

---

[2] King testified that neither she nor Carr as an entity knew that the pilaster was glued to the wall when Carr took over managing the property, and that from the time that they took over managing the property in 2012 to the incident in 2015, the lobby area had stayed the same and no work had been done on the pilaster. King first learned that the pilaster was glued to the wall after the incident. King also testified that no complaints were made about the lobby or any of the pilasters

(continued…)

points first to the following evidence from which he contends a jury could infer that appellees were nevertheless on constructive notice that the manner of affixation was not secure: deposition "testimony and evidence that [Carr] and/or entities [with which] it contracted, regularly physically polished, shined, and/or cleaned" the lobby and pilasters, including the one that fell and injured Mr. Jones. Mr. Jones contends that given the frequency of cleaning and manipulation, and given the "expert testimony about the obvious looseness of the pilasters," a reasonable jury could find that the hazard from the pilaster's dangerously loosened condition was reasonably foreseeable.

Mr. Jones's reference to expert testimony about "obvious looseness" is a reference to an April 2, 2019, addendum letter prepared by his expert, Brian Bramel, who, after reviewing the deposition transcript of David Seagraves, the

---

(…continued)

before the incident. Ravan testified similarly at his deposition, stating he was unaware that the pilasters were affixed with glue and that there had been no complaints about the metal pilasters. Corsillo stated that prior to the incident, he had "no clue" how the pilasters were affixed to the wall and that no pilasters had ever come loose before this incident. In addition to these witnesses, Carr's remediation contractor was asked during his deposition whether, prior to the incident, there was any way for the building owner to look at the pilasters and determine how they were attached, and he replied, "[n]o. Only if they observed the work during the installation process." Finally, a report prepared for Carr by expert James Schofield concluded that the "defect that led to the incident was a latent defect dating back to 1990, with a very long time for failure."

president of Columbia Woodworking, Inc. (the company hired by Carr to repair the pilaster after the incident), opined that the handling of the pilasters should have revealed that the pilasters were loose.

However, Mr. Jones's argument mischaracterizes both the record evidence regarding the extent to which the pilaster was handled and Seagraves' testimony regarding the looseness of the pilaster. When asked what maintenance was done on the pilasters prior to the incident, King replied, "[n]o maintenance that I'm aware of" and stated that the pilasters would be polished by a porter working for the janitorial company only on an "as needed," "spot treatment" basis.[3] In discussing his physical assessment of the pilasters, Seagraves testified that by "grabbing" them, he determined that most were loose and would have "possibly come down at some point." But he agreed that he "kind of shook [them] a little bit to see if they were loose" and that "they did need to be . . . gently pried and tapped." He added, "I think we actually probably beat on them a little bit with rubber mallets to fracture the adhesion and were able to loosen them up with a little effort." Seagraves agreed that before using the rubber mallets, he could tell that some of the pilasters were loose "just by physically using [his] hands to touch them

---

[3] The affidavit of Nikki Stuart, an employee of the janitorial company, states that the scope of the company's work did not include maintaining, cleaning or other action on the trim that is the subject of this lawsuit.

or move them." But asked whether, before the incident, anyone who physically went to move the pilasters could tell that they were loose, Seagraves replied, "99 percent of the people wouldn't notice that." He explained, "it would have to be almost a building inspector type" to touch one and say, "this could be an issue."

Thus, Seagraves's testimony does not support Mr. Jones's claim that a janitor simply polishing and cleaning the pilasters from time to time (and not trying to move them) would have noticed that they were loose and in danger of falling. Asked whether Corsillo, the chief engineer would have been able to tell that the pilaster was loose just by touching it, Seagraves replied, "[m]aybe if he tugged on one and pulled on it and moved it." Given (1) the reliance that Mr. Jones and his expert placed on Seagraves's assessment, (2) Seagraves's testimony regarding the low likelihood that most people would be able to detect an issue with the pilaster by touch, and (3) the absence of evidence that tugging and pulling on pilasters is a necessary aspect of maintenance in a building with such an architectural feature, we conclude that the record does not reflect a genuine dispute about whether the polishing and cleaning of the pilasters put defendants/appellees on constructive

notice about the dangerous condition of the pilaster's adhesive and about the foreseeability of injury from a falling pilaster.[4]

The second piece of evidence Mr. Jones cites is his expert's discussion of the pilaster's slow vertical descent or "creep" as the glue holding it on the lobby wall "stretched and failed."  Bramel asserted in his report that the closing of the "intentional gap" between the pilaster and its rock base would have been an "observable indicator that the adhesive failed," because the gap would have closed as the pilaster "displaced vertically and became supported by the rock base."[5]  Mr. Jones argues that given the frequency with which appellees' employees, including the Westory's longstanding Chief Engineer, "passed by the architectural pilaster performing visual inspections . . . , there would [have been] ample opportunity for [appellees] to have observed the change in its appearance" and to have initiated an investigation into its safety.

---

[4]  While Seagraves was not offered as a standard-of-care expert, we note that when asked about appropriate maintenance of the pilasters, Seagraves explained that once they were glued, "short of it coming loose you would never do a maintenance program for [the pilaster]."

[5]  The context makes clear that Bramel's phrase "displaced vertically and became supported by the base" is a theoretical explanation; there is no record evidence that the pilaster actually was displaced and became supported by the rock base at any time before the pilaster fell off the lobby wall.

But when asked at what point in time the pilaster displaced vertically, Bramel stated that it would take years for the pilaster to become supported by the rock base, that he did not have the exact "creep rate," and that he could conduct a test and "give you the answer in 20 years." Bramel also opined that the "final failure" of the adhesive on the pilaster appears to be a brittle failure," which could be a "sudden[] fail." Further, Carr's property manager and building engineers testified that they visually inspected the Westory lobby on a daily basis and saw nothing out of the norm before the incident.[6] Given Bramel's inability to provide a creep rate; the lack of record evidence indicating how much change, if any, there was in the gap between the bottom of the pilaster and its rock base from the time appellees purchased and began managing the Westory to the time of the incident; the testimony by appellees' property manager and engineers to the effect that they

---

[6] King testified that she visually inspected the Westory lobby "daily, as we're walking through" and noted that the janitorial company, a day porter, engineers and a security vendor were also in the lobby daily. Ravan likewise testified that he had the ability to look at the pilasters on a daily basis. Corsillo, who not only was the building's Chief Engineer for Carr but also had held the same position with the building's prior owner, testified that he walked through the main lobby where the pilasters were located at least three times a day, that he performed inspections of the main lobby "numerous times," and that if he or someone on the property management team saw "something out of the norm" during these inspections, they would "take care of it." Asked about inspections of the pilasters, King responded that this would have been done only if something "seemed crooked or visually not right" "because quite frankly, one wouldn't know that it wasn't part of the wall."

saw no indications of creep during their visual inspections of the Westory lobby; and the possibility of a "sudden[] fail," we conclude that Mr. Jones failed to present evidence sufficient to make it a disputed fact whether "visual creep" would have alerted appellees to the defective condition of the pilaster and rendered the risk of injury foreseeable.

The third piece of evidence Mr. Jones cites is the May 2012 Pond Robinson report, entitled "Report of Physical Condition Assessment." The report indicated that the interior finishes of the Westory were "considered to be of good quality and durability" but noted that "[r]outine upgrades and repairs to the Main Lobby . . . should be anticipated over the term." Mr. Jones asserts that the report provides evidence of appellees' knowledge of "the age of the lobby fixtures, including the [pilaster]" and of "recommendations . . . to upgrade the same." He argues that in light of this evidence, "a reasonable jury could have determined that by failing to follow through with recommended steps to upgrade the lobby by 2014, . . . [appellees] missed a reasonably foreseeable opportunity to learn of the hazardous architectural pilaster."

The Pond Robinson report was not sufficient to raise a dispute as to whether the cause of Mr. Jones's injury was foreseeable. Mr. Jones does not explain how

the report's recommendation of an "[a]llowance for a *cosmetic* upgrade in the Main Lobby finishes" (italics added) alerted appellees that the pilasters in the Westory's lobby might detach.[7] The report listed no safety concern with respect to the pilasters and made no mention of them being affixed to the wall with glue.[8]

---

[7] When asked what NY Life and REEP's understanding was as to the cosmetic upgrades being recommended, Dennis Morris, the director of asset management at NY Life, replied, "[t]hey would have been referring to minor things such as anything from improving tile, a different type of tile, different type of light fixture, different wall coverings. Minor cosmetic things."

[8] At oral argument, Mr. Jones relied on *Sandoe v. Lefta Assocs.*, 559 A.2d 732 (D.C. 1998), to argue that the appellees had a "duty to inspect the premises for latent, dangerous defects." *Id.* at 744. In *Sandoe*, the evidence that the building owner "had not conducted an inspection of the property in the eleven years of its possession preceding [the plaintiff's] injury" supported submitting the question of reasonable care to a jury, but did not entitle the plaintiff to a directed verdict, because "[a] jury could reasonably find that the nature of the defective condition . . . was of such . . . character as to be discoverable only by an extraordinary investigation beyond the requirements of reasonable care under the particular circumstances." *Id.* at 745.

Here, by contrast, appellee REEP had the Westory, including its lobby, inspected by engineers (Pond Robinson) in May 2012, the same year REEP acquired the building, which was just a few years before the January 2015 incident that injured Mr. Jones. The evidence was not sufficient to send to a jury the question of whether REEP breached a duty of inspection in the absence of expert testimony — and there was none — about a standard of care that mandated an additional inspection before the January 2015 incident. *See Tolu*, 945 A.2d at 601 (when the applicable standard of care is not known by the average juror, then expert testimony is required for a plaintiff to meet his burden); *Sullivan v. AboveNet Commc'ns, Inc.*, 112 A.3d 347, 358 (D.C. 2015) ("[I]f the standard itself is not proven, then a deviation from that standard is incapable of proof." (internal quotation marks omitted)).

The final piece of evidence to which Mr. Jones points is his own testimony that his employer experienced "significant vibrations in their building office during exterior renovation work and experienced a number of falling debris from this work," not only after but also before his injury from the falling pilaster. He argues that evidence of "prior complaints of vibrations causing objects to fall within the building would clearly be probative to a jury regarding the reasonable foreseeability" of the pilaster's falling. Mr. Jones acknowledges that appellees deny having received complaints regarding vibrations,[9] but argues that the "clear difference in [the parties'] accounts regarding recollection of complaints regarding these vibrations, and the material nature of this evidence to the issue of constructive notice," dictate reversal of the grant of summary judgment.

We are not persuaded by Mr. Jones's argument. Even if we assume arguendo that receipt by REEP and Carr of complaints about vibrations and falling debris during the façade renovation would have put appellees on notice that the pilaster might fall and cause injury, the record is devoid of evidence that any of the appellees actually received complaints about vibrations and falling items.

---

[9] Lindman's representative testified that in doing the façade restoration work, Lindman used small hand tools that caused "only a tiny bit of vibration."

Although Mr. Jones asserts that there were email complaints to the property manager about fallen debris "as a result of vibrations," no such emails are contained in the record, and the only record evidence regarding these emails is Mr. Jones's deposition testimony, which described only correspondence to building management about falling debris and collapsed ceiling tiles. Mr. Jones provided no detail regarding what, if anything, was specifically said about vibrations in the building; when asked to confirm that he saw emails relative to vibrations or other problems," Mr. Jones answered, "Falling debris."

Further, Mr. Jones's deposition testimony regarding his personal observations fails to draw a link between the falling debris and vibrations. For example, although Mr. Jones testified that following his injury, a metal sprinkler cover fell near him while he was working at his desk on a day when the façade restoration was underway, he testified that he did not perceive vibrations at the time the cover fell and that he did not know why it fell. Similarly, after testifying that ceiling tiles had collapsed on his desk not long after the metal sprinkler cover incident, when asked about the cause of the collapse, Mr. Jones stated that "[t]he pipes did something, and water caused those ceiling tiles to collapse." When asked whether the falling tiles were connected to vibrations or anything going on outside the building, Mr. Jones testified that he did not know. Finally, Lindman was not

working at the Westory on the day the pilaster fell (presumably meaning that there were no vibrations on that day). In light of all the foregoing, appellant's testimony about vibrations was too slim a reed to create a genuine issue as to whether appellees were on notice of the dangerous condition of the pilaster.

## 2. Lindman

We also find that appellant failed to establish a genuine dispute as to constructive notice and reasonable foreseeability of injury as to Lindman. Appellant repeats his argument regarding complaints of vibrations connected with Lindman's work, arguing that evidence of these complaints would have made "vibration-related damage like the falling pilaster reasonably foreseeable" to Lindman. For the reasons already discussed, we find this argument unpersuasive.

Appellant also argues that Lindman failed to perform inspection surveys before, during, and after its renovation work and that a reasonable jury could have found on that basis that Lindman "missed a reasonably foreseeable opportunity to detect[,] and alert" REEP and Carr about, the unsafe condition of the pilaster. Contrary to appellant's assertion, however, no expert testimony established an industry standard regarding such inspections. Mr. Bramel testified that "in typical

construction[,]" inspection "is done by the general contractor who is having the work done," but his testimony did not establish that, by industry standard or even custom, a contractor such as Lindman, whose contract with Carr was for "general cleaning" of the building's exterior façade and mortar replacement, had a duty to inspect the interior of the building. Mr. Bramel also testified that the manner of inspection "[d]epends on the standard and who is doing the inspection" and stated that "there is no specific standard." Although Bramel asserted that he would have rapped on the lobby elements if he were the one to conduct the inspection, his testimony failed to establish what if any standards Lindman violated and how they were violated. *See Sullivan*, 112 A.3d at 358 (explaining that when normative standards are used by an expert as a basis for assessing negligence, the expert must be specific as to what standards were violated and how they were violated).

### B. Res Ipsa Loquitur

"The doctrine of res ipsa loquitur permits the jury to infer a lack of due care from the mere occurrence of an accident." *Hailey v. Otis Elevator Co.*, 636 A.2d 426, 428 (D.C. 1994) (internal quotation marks omitted) (quoting *Otis Elevator Co. v. Henderson*, 514 A.2d 784, 785 (D.C. 1986)). For that reason, "it is a powerful doctrine which 'should be applied with caution in a negligence action so

that the mere happening of an accident will not permit the inference of a defendant's liability.'" *Id.* (quoting *Washington Sheraton Corp. v. Keeter*, 239 A.2d 620, 622 (D.C. 1968)). For the doctrine to apply, "the plaintiff must present sufficient evidence to establish three elements: (1) The event must be of the kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the control (exclusive or joint) of the defendant; [and] (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." *District of Columbia Hous. Auth. v. Pinkney*, 970 A.2d 854, 866 (D.C. 2009) (quoting *Henderson*, 514 A.2d at 785).

This court has explained that "[*r*]es ipsa loquitur becomes irrelevant only when the manner in which the defendant was allegedly negligent is 'completely elucidated' . . . and 'there is nothing left for the jury to infer regarding the cause of the accident.'" *Pinkney*, 970 A.2d at 868 (quoting *Gubbins v. Hurson*, 885 A.2d 269, 283–84 (D.C. 2005)); *see also Hailey*, 636 A.2d at 429 ("[R]es ipsa loquitur asks the jury to consider a question of fact on which little evidence has been presented[.]"); *Levy v. Currier*, 587 A.2d 205, 212 (D.C. 1991) ("In this case the cause of the fire was essentially undisputed; the issue being litigated was whether liability for the damage should fall on Currier. We agree with the trial court that *res ipsa loquitur* had nothing to do with this case."); *Sullivan v. Snyder*, 374

A.2d 866, 868 n.1 (D.C. 1977) ("It is only when there is sufficient proof of the manner in which the defendant was negligent that the plaintiff can no longer rely on *res ipsa loquitur*. When a specific act of negligence is proved there is nothing left for the jury to infer regarding the cause of the accident and *res ipsa loquitur* simply vanishes from the case.") (internal quotation marks omitted); *Moore v. Clagett*, 48 App. D.C. 410, 415 (D.C. Cir. 1919) ("[I]f plaintiff by his petition is shown to be sufficiently advised of the exact negligent acts causing, or contributing to his injury, as to plead them specifically, as in this case, then the reason or the doctrine of presumptive negligence has vanished. If he knows the negligent act, and he admits that he does so know it by his petition, then he must prove it[.]").

We agree with the trial court that the res ipsa loquitur doctrine does not apply in this case because the evidence points to a complete explanation of the incident and its cause. Undisputed record evidence indicates that the pilaster fell because the adhesive used to mount it had weakened or deteriorated over time. To wit, Carr's expert Schofield noted in his report that "there is no dispute that the trim pieces were attached with adhesive only prior to the incident, and that the adhesive at the incident location failed." Schofield cited "the likelihood that the 25-year-old adhesive became dry and brittle over time, and eventually failed."

Carr's remediation contractor Seagraves testified during his deposition that the glue affixing the pilaster to the lobby wall was "bound to fail" because it "crystalizes over time and hardens and then it [loses its] elasticity." Likewise, Mr. Jones's expert, Bramel, cited the "final . . . brittle failure" of the adhesive on the pilaster as the cause of the pilaster's falling.[10]

Nor is the second condition for application of the res ipsa loquitur doctrine satisfied, because the record does not support an assumption that a pilaster's falling "ordinarily does not occur in the absence of someone's negligence." No evidence in the record suggests (and Mr. Jones makes no claim) that the falling of a pilaster or similar trim element is a matter of common experience, whether among the general public or among the relevant community of professionals, such that it can be said that it "ordinarily" does not occur in the absence of negligence. In addition, the evidence did not establish that a building owner, manager, or exterior façade contractor must, as a matter of ordinary due care, perform inspections to ascertain whether a pilaster is firmly affixed in the circumstances of this case.[11]

---

[10] We discern no reason why that the (apparent) unknowability of the "cause of the pilaster falling on that specific day" should make a difference to the analysis.

[11] Appellant argues that disallowing application of the res ipsa loquitur doctrine in this case would have "devastating consequences downstream for future victims of injuries in commercial premises" because it would permit one "liability-

(continued…)

There is yet another, more fundamental reason why the res ipsa loquitur doctrine was not apposite in this case. "[T]his court and others have held that in cases in which notice is an essential element of a plaintiff's claim, *res ipsa loquitur* is inapplicable because it is inconsistent with the requirement of notice." *Mixon v. Wash. Metro. Area Transit Auth.*, 959 A.2d 55, 60 (D.C. 2008); *see also Hackett v. District of Columbia*, 264 A.2d 298, 300 (D.C. 1970) (explaining that the doctrine of res ipsa loquitur is not applicable in types of cases where the defendant "must receive [prior] notice [of a defective condition] to be held liable"). As a matter of law, appellees cannot have been negligent with respect to the pilaster if they were without constructive notice of its tenuous affixation and therefore had no duty to remedy its condition in order to avoid foreseeable injury. Thus, application of the res ipsa loquitur doctrine as a

---

(…continued)
free pass for an injury" if the defendants can demonstrate that they were not aware of "an identical occurring incident in the past," and if they were inattentive to both "visual and tactile physical indications of an issue in a used building they purchased[.]" As the preceding discussion indicates, appellant's assertion does not accurately portray the facts of this case. To the contrary, record evidence indicates that REEP and Carr took steps to assess and maintain the safety of the building by enlisting an engineering firm to assess the building's condition at the time of purchase and by having staff attend to the care and maintenance of the lobby on both a daily and monthly basis. In addition, the evidence does not show that there were "visual and tactile physical indications of an issue" to which appellees were inattentive.

substitute for proof of negligence would have been unavailing to permit Mr. Jones to recover for his injury. For that and the foregoing reasons, we conclude that the trial court did not reversibly err in ruling that the res ipsa loquitur doctrine did not permit Mr. Jones to avoid summary judgment.

## IV. Conclusion

On the record presented to the trial court, a jury could not reasonably have found that appellees were on notice of the hazardous condition of the pilaster and that the risk of injury to appellant was foreseeable, such that appellees had a duty to act so as to prevent his injury. Nor would Mr. Jones have been entitled to a res ipsa loquitur instruction to establish that the defendants/appellees were negligent. Accordingly, the trial court did not err in granting summary judgment in favor of defendants/appellees, and the judgment of the Superior Court is

*Affirmed.*