Mark ZOERB, et al., Appellants,

v.

**BARTON PROTECTIVE SERVICES,**
Appellee.

No. 03–CV–224.

District of Columbia Court of Appeals.

Argued May 18, 2004.
Decided June 10, 2004.

Patricia L. Payne, with whom Jordana J. Hughes was on the brief, for appellants.

James B. Sarsfield, Washington, with whom Kevin J. O'Connell and Alexander Francuzenko were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and NEBEKER, Senior Judge.

SCHWELB, Associate Judge:

On September 25, 1996, Mark Zoerb, an engineer employed by Carr Real Estate Services, Inc., at Metropolitan Square, a thirteen-story commercial office building in Washington, D.C., was struck on the head by a descending elevator and seriously injured while he was standing on a ladder in the elevator shaft and searching for a lost set of keys. Zoerb and his wife, Linda, subsequently brought this action for negligence [1] against Barton Protective Services, Inc., a corporation which provided security services for Carr at Metropolitan Square.[2] After discovery had been conducted, a judge of the Superior Court granted partial summary judgment in favor of Barton, ruling as a matter of law that Barton was not responsible for Zoerb's initial injury. The case proceeded to a jury trial on Zoerb's claim that Barton proximately caused an aggravation of Zoerb's injury

from the blow to his head by negligently failing to locate Zoerb in the elevator shaft within a reasonable time after the accident, and by thus delaying his rescue.

On January 30, 2003, after the Zoerbs had completed the presentation of their evidence, the trial judge granted Barton's motion for judgment as a matter of law (JMOL). The judge concluded that the plaintiffs had not established the applicable standard of care or its breach. Further, in the judge's view, the plaintiffs had failed to prove that Barton's alleged negligence was the proximate cause of any quantifiable aggravation of Zoerb's injury. Finally, the judge ruled as a matter of law that Zoerb had been contributorily negligent.

The Zoerbs filed a timely notice of appeal. Because we are satisfied that any claimed injury to Mark Zoerb resulting from Barton's alleged negligence was entirely speculative, we affirm the judgment without reaching any other issue.

## I.

### THE TRIAL COURT PROCEEDINGS

A. *The events of September 25–26, 1996.*

The evidence, viewed in the light most favorable to the Zoerbs, *see Pazmino v. WMATA*, 638 A.2d 677, 678 (D.C.1994), reveals that shortly after he arrived at work after 4:00 p.m. on the afternoon of September 15, 1996, Zoerb received a call on his walkie-talkie from Michelle Kiah, an employee of Carr. Ms. Kiah requested that Zoerb retrieve some keys that had accidentally been dropped in an elevator shaft. Zoerb set out to search for the keys. At

---

1. Mrs. Zoerb's claim in this action was for loss of consortium.

2. Zoerb initially sued F Street Realty Co., which was erroneously named as the owner of the premises, and Otis Elevator Co., which

had manufactured, installed, and maintained the elevators at Metropolitan Square. The trial court granted summary judgment to each of these defendants, and neither is a party to this appeal.

approximately 5:35 p.m., a security camera maintained by Carr showed Zoerb exiting from a lobby elevator, walking across the lobby, opening an elevator door with a special door key used by engineers, and then disappearing through the open elevator door. Zoerb subsequently failed to respond to radio calls, and a search for Zoerb began.

At approximately 7:00 p.m., a Barton security officer telephoned Linda Zoerb at home and inquired whether she knew where her husband was. Mrs. Zoerb told the security officer that when she had last spoken to her husband, he had told her that he was going to check out some keys that had been dropped in an elevator shaft.

Following this conversation, Mrs. Zoerb, as well as Mark Zoerb's father, Jim Zoerb, made a number of telephone calls to Metropolitan Square, reiterating that Mark Zoerb had gone to search for keys in an elevator shaft. Barton's security officers, however, did not at that time record, or pass on to Barton's Command Center, the information provided by Mrs. Zoerb. The search for Zoerb continued, but Barton's security officers, who had no access to the elevator shafts, made no attempt at this time to contact Otis Elevator Co., which did have access, or to alert the Metropolitan Police or the Fire Department.

Between 8:30 and 8:45 p.m., a Barton security officer contacted Alan Johnson, Carr's acting Chief of Engineers, and advised him that Zoerb had been missing for "quite some time." Carr personnel proceeded to Metropolitan Square and were on the scene by approximately 9:30 p.m. At approximately 11:00 p.m., Zoerb's wife and father arrived to assist in the search, and they urged those searching for Zoerb to direct their efforts to the elevator shaft.

Johnson initially declined to follow this suggestion, concluding that if Zoerb had proceeded to the elevator shaft, as Linda and Jim Zoerb believed, he would have requested one of the security guards to assist him.

The police were called at 11:00 p.m., but officers did not arrive for approximately another hour and a half. At 11:47 p.m., Johnson telephoned Otis Elevator Co. An Otis representative arrived at 12:30 a.m. on September 26. Approximately one half-hour later, at 1:00 a.m., Zoerb was found at the bottom of an elevator shaft. He was suffering from head injuries. Zoerb was removed from the shaft at 1:45 a.m., and he was immediately rushed to the George Washington University Hospital emergency room. Zoerb arrived at the hospital at approximately 2:00 a.m. He was finally treated with medication to reduce intercranial pressure at 4:00 a.m., some ten and a half hours after he entered the elevator, and more than four hours after Johnson's call to Otis.

B. *Zoerb's injuries and their alleged aggravation as a result of the delays in treatment.*

The medical witnesses who testified on behalf of the Zoerbs were Nooreddin Mirmirani, M.D., a psychiatrist, and Peter Bernad, M.D., a neurologist. Dr. Bernad testified that Zoerb sustained a moderate to severe head injury when he was struck by the descending elevator, including a contusion to the frontal parts of the brain, a skull fracture, and brain hemorrhage. Dr. Bernad concluded that Zoerb "must have been hit pretty hard" by the elevator to have sustained such a significant brain injury. Dr. Bernad acknowledged that Zoerb's symptoms at the time of trial [3]

---

**3.** Zoerb suffered permanent physical, psychological and emotional injuries. Zoerb's work-

ing memory, attention span, spatial skills, visual motor speed and efficiency, emotional

were "part and parcel of plaintiff's moderate to severe closed head injury," and that Zoerb's closed head injury alone, without delay in medical treatment, was sufficient to cause Zoerb's symptoms as they existed more than six years after the accident. Nevertheless, the Zoerbs claimed that delay in Mr. Zoerb's treatment resulted in the aggravation of his injuries, and they sought damages from Barton for any aggravation attributable to Barton's role in that delay.

Dr. Mirmirani testified that "the sooner that Mr. Zoerb would have been treated, the better off he would have been." According to Dr. Mirmirani, Zoerb's condition "deteriorated continuously." Dr. Mirmirani was prepared to state "with medical certainty" that Zoerb's condition "would be better if he had been discovered earlier." The witness could not, however, "quantify specifically" the level of improvement. Dr. Mirmirani was likewise unable to state what Zoerb's condition was an hour or two hours after the accident. Dr. Mirmirani also acknowledged that, at his pretrial deposition, he had testified as follows:

QUESTION: Do you have an understanding of how long that delay was?

ANSWER: I think that it was a number of hours. I can't recall the exact time. It was a number of hours he was missing and they could not find him.

QUESTION: In your opinion, did that delay have any impact on his current condition?

ANSWER: *It's hard to say. It's hard to be accurate because he did have an injury, a head injury.* .

He was unconscious and obviously, when you have traumatic brain injury, the tissues and the inside of the brain swells. So, it would be good to immediately intervene to reduce the swelling so that you would have less trauma to the brain as a general rule.

QUESTION: But, as far as the impact on his ultimate condition, can you say with any specificity how much it worsened or did not worsen based on—

ANSWER: *I cannot be certain of that.* (Emphasis added.) [4]

After the basic thrust of Dr. Mirmirani's testimony became apparent, the trial judge called counsel to the bench, and the following transpired:

THE COURT: I am not sure if you are leaving this area.

I am not sure that this jury has a basis on anything that he has said to be able to determine what, if any, effect that the delay had on Mr. Zoerb's condition other than a general statement that the sooner that you get treatment, the better.

MS. HUGHES Your Honor,-
[Counsel for plaintiffs]

THE COURT: I mean if that is all that he can give us, that may not be enough.

MS. HUGHES: He is not the only witness who will be testifying as to this issue, Your Honor.

THE COURT: All right.

MS. HUGHES: We have an expert neurologist who will be testifying more accurately on the extent to which the delay impacted.

THE COURT: All right.

---

control and reasoning ability were all said to have been impaired.

4. When he gave evidence at trial, Dr. Mirmirani was quite vague as to whether he was adhering to or retreating from this significant concession in his deposition testimony. Be-

cause we view the record in the light most favorable to the Zoerbs, we must resolve this ambiguity in their favor, but Dr. Mirmirani's deposition testimony is nevertheless significant.

MS. HUGHES: Your Honor, I want to ask the question as a follow up.

THE COURT: All right. That's helpful to me to know that. That may not be able to necessarily resolve it with just this witness.

The neurologist will testify with respect to what effect that the delay had on the current condition?

MS. HUGHES: Exactly, Your Honor.

Notwithstanding this representation by counsel for the Zoerbs, Dr. Bernad's testimony added little if anything of substance to Dr. Mirmirani's analysis with respect to the consequences of the delay or of any part of it. When he was asked by plaintiffs' counsel "what effect if any the delay in treatment had on Mark Zoerb's condition, as it exists today," Dr. Bernad stated that "one cannot separate or tease out percentages," but that the "seven hour or so delay" was significant and that Zoerb should have been seen and treated earlier. Dr. Bernad continued:

> I believe that the delay did cause an effect, did have the secondary effects of swelling and so forth that we talked about. And had he been found earlier, th[ese] secondary factors could have been treated and could have been avoided to some extent.

Asked how much sooner Zoerb would have had to be treated to avoid the deterioration of his condition, Dr. Bernad responded that "you can't say how much sooner" but that "the sooner the better."

On cross-examination, Barton's attorney asked Dr. Bernad as to how soon after Zoerb's injury the secondary effects of that injury—swelling, edema, consequent compression and more swelling—began. Dr. Bernad responded that "there may be some minutes, possibly even a half an hour or an hour, where things are quiescent and

then the swelling . . . starts." In response to a question from the judge, Dr. Bernad stated that in Zoerb's case "the swelling would have occurred sooner" than in cases of less severe trauma.

Neither medical expert for the plaintiffs provided any estimate as to how long after the injury any deterioration continued. Moreover, neither expert was able to suggest what, if any, part of Zoerb's condition was attributable to the entire ten and a half hour delay from accident to treatment, or to any particular portion of that delay.

C. *The trial judge's decision.*

At the conclusion of the plaintiffs' case, the trial judge granted JMOL in favor of Barton. The judge devoted most of his comprehensive oral opinion to a discussion of the question whether the plaintiffs had presented sufficient evidence to permit the jury to determine whether Barton had breached a national standard of care; the judge answered that question in the negative. The judge also gave careful attention to the issue of causation, opining as follows:

> Secondly, I conclude that there was a failure of proof that Mr. Zoerb's current condition is causally related to a delay in his treatment attributable to the Barton guards.
>
> . . . .
>
> Based on the evidence in the record, the earliest that anyone could have guessed that Mr. Zoerb might be trapped in a live elevator was 7:00 p.m. By that time Mr. Zoerb could have been laying injured for up to two and a half hours.[5]

Combined with that passage of time, is the additional time to call Otis Eleva-

---

5. The judge undoubtedly meant to say one    and a half hours.

tor or the city's fire service assuming they had access to the elevator shaft.

Immediate treatment was an impossibility and no medical witness was able to quantify whether the passage of one hour, two hours or three or four hours were enough to irreversibly cause Mr. Zoerb's current injuries.

The evidence does not support that any delay by the Barton guards to call city fire services or Otis Elevator was the proximate cause of Mr. Zoerb's current injury.

The Zoerbs filed a timely notice of appeal.

## II.

### LEGAL ANALYSIS

▮▮▮ In an action for negligence, the plaintiff bears the burden of proof in three areas: the applicable standard of care, a deviation by the defendant from that standard of care, and a causal relationship between that deviation and the plaintiff's injury. *Messina v. District of Columbia,* 663 A.2d 535, 537 (D.C.1995). In the present case, even if we assume, without deciding, that the Zoerbs established the standard of care and its breach, their case founders on the third requirement, namely, causation. Moreover, "[a] jury verdict may not rest on speculation as to damages," *Pratt v. Univ. of the District of Columbia,* 691 A.2d 158, 159 (D.C.1997) (per curiam), and in this case, any jury award would necessarily be altogether speculative.

▮▮▮ By granting JMOL, the trial judge effectively directed a verdict in Barton's favor. "On a motion for directed verdict, the record must be viewed in the light most favorable to the non-moving party, and that party ... is entitled to the benefit of every reasonable inference from the evidence." *Washington Metro. Area Transit Auth. v. Jeanty,* 718 A.2d 172, 174

(D.C.1998). A verdict may be directed only when the evidence is so clear that reasonable jurors could reach but one conclusion. *Bauman v. Sragow,* 308 A.2d 243, 244 (D.C.1973) (per curiam). Conversely, a verdict must be directed, and JMOL granted, where the plaintiff's evidence is insufficient as a matter of law. *Clement v. Peoples Drug Store, Inc.,* 634 A.2d 425, 427–29 (D.C.1993); *id.* at 429–30 (concurring opinion). Whether the evidence was sufficient to go to the jury is a question of law, which we consider *de novo. Phillips v. District of Columbia,* 714 A.2d 768, 772–73 (D.C.1998) (citations omitted).

In the present case, the trial judge was of the opinion, with which we agree, that "the earliest anyone could have guessed that Mr. Zoerb might be trapped in a live elevator was 7:00 p.m." This was the approximate time that Mrs. Zoerb first provided information regarding her husband's intention to find and recover a set of keys in the elevator shaft. Even if Barton had contacted Otis Elevator Co. at that exact moment, this would not have achieved treatment for Zoerb for many hours to come. As events actually transpired, Otis was contacted at 11:47 p.m., but Zoerb was not treated until 4:00 a.m., or almost four and a quarter hours later. Thus, if Otis had been contacted at 7:00 p.m., then, other things being equal, Zoerb would not have received treatment until approximately 11:15 p.m., almost six hours after the accident.

Moreover, even if Barton violated the standard of care, as the Zoerbs contend, not all of the delay could reasonably be attributed to Barton. At approximately 8:30 or 8:45 p.m., a Barton security officer contacted Carr's Acting Chief Engineer, Alan Johnson, to inform him that Zoerb had been missing for some time. Unlike Barton, Carr had access to the elevator shaft. The Barton security guards worked

at the direction of Carr, and were not in a position to override Carr's decisions. When Johnson initially declined to contact Otis, the delay—perhaps two hours—occasioned thereby was Carr's delay, not Barton's.

Under these circumstances, the conclusion is inescapable that even if Barton had alerted Carr and perhaps Otis at 7:00 p.m., six to eight hours, and perhaps more, would have elapsed between the accident and the beginning of Zoerb's treatment at George Washington University Hospital. According to Dr. Bernad, the swelling, and Zoerb's secondary injuries, probably commenced very soon after the accident, perhaps minutes, perhaps an hour or so. At his deposition, Dr. Mirmirani found it difficult to say whether the entire delay had had any identifiable effect on Zoerb's condition, and he did not really withdraw this concession in his trial testimony. Moreover, Dr. Bernad acknowledged that Zoerb's initial "closed head" injury, aside from any delay, could reasonably have accounted for Zoerb's current condition. Given all of these facts, and viewing the record in the light most favorable to the Zoerbs, no impartial juror could reasonably find, without engaging in impermissible speculation, see Baltimore v. B.F. Goodrich Co., 545 A.2d 1228, 1231 (D.C. 1988), that a delay of ten and a half hours between injury and treatment aggravated Zoerb's condition more than a delay of six to eight hours would have done.[6]

■ Moreover, even if we were to conclude—which we do not—that generaliza-

tions such as "the sooner the better," without evidence as to how much sooner was how much better, were sufficient to preclude the direction of a verdict as to liability, the jury would face an impossible task in attempting to make a rational award of damages. "While damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages." Romer v. District of Columbia, 449 A.2d 1097, 1100 (D.C.1982). "[T]he fact of damage and a reasonable estimate must be established." Garcia v. Llerena, 599 A.2d 1138, 1142 (D.C.1991) (quoting Bedell v. Inver Hous., Inc., 506 A.2d 202, 205 (D.C. 1986)) (quoting W.G. Cornell Co. v. Ceramic Coating Co., 200 U.S.App. D.C. 126, 129, 626 F.2d 990, 993 (1980)). We are at a loss to understand how an impartial jury could be expected to determine, on this record, the amount of damages that Barton should be required to pay.[7]

The Zoerbs contend that if the damages cannot reasonably be apportioned, then Barton should be held liable for Zoerb's entire injury. They rely on Graham v. Roberts, 142 U.S.App. D.C. 305, 441 F.2d 995 (1970), a dental malpractice case in which the defendant permitted the patient's condition to worsen progressively by failing to refer the patient to a specialist. In ruling for the patient, the court stated:

> True, the appellant's sinus infection was initiated by an innocent cause, and not by negligence attributable to Dr. Rob-

---

6. Robinson v. Group Health Ass'n, 691 A.2d 1147 (D.C.1997), relied on by the Zoerbs, does not support their position. In Robinson, there was ample evidence that the aggravation of the plaintiff's condition occurred as a result of a period of delay all of which was attributable to the defendant. An impartial jury could reasonably find that, as a consequence of this delay, the plaintiff suffered a

more serious and invasive amputation then would otherwise have been necessary.

7. Where the proof of damages is speculative and vague, nominal damages may be awarded. Garcia, 599 A.2d at 1142. However, reversal for failure to award nominal damages is not required. Henson v. Prue, 810 A.2d 912, 916 (D.C.2002).

erts, but his negligence in not making a prompt referral allowed the disease to spread to a serious stage. Apparently, there was no evidence adduced at trial by either side regarding what proportion of the appellant's damage was attributable to the lack of a prompt referral. We hold with the better modern authorities that the culpable defendant in such situations is liable for all damages unless he introduces evidence from which a fair apportionment can be made, *Restatement (Second) of Torts*, §§ 433A, 433B, and 450 (1965), and Prosser on Torts § 43 (3rd ed.1964); hence Dr. Roberts was properly assessed for the defendant's entire damages.

142 U.S.App. D.C. at 308, 441 F.2d at 998.

■ This reasoning can have no application here. First, the trial court granted partial summary judgment in favor of Barton with respect to whether that defendant was liable for injuries resulting from the accident itself. Second, there can be no doubt, on this record, that Zoerb's condition is attributable for the most part, if not entirely, to the head injury inflicted by the descending elevator. Any aggravation resulting from the allegedly unreasonable delay on Barton's part is speculative. Apportionment is appropriate "whenever two or more factors have combined to bring about harm to the plaintiff, and *each has been a substantial factor in producing the harm.*" RESTATEMENT (SECOND) OF TORTS § 433 A cmt. a (1965) (emphasis added). This was true in *Graham*, but the Zoerbs have made no such showing here. Accordingly, we conclude that, on the present record, it would be inappropriate to hold Barton responsible for all of the consequences of Zoerb's accident, when the accident was not attributable to Barton at all.

## III.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*[8]

---

8. The Zoerbs contend that the trial judge abused his discretion by declining to permit a clinical psychologist, Dr. John Smothers, to testify regarding the effects of the delay on Mark Zoerb's condition. Dr. Smothers is not a physician and has no medical training or experience. He conceded in his deposition that this subject "certainly is a matter that lies more with physicians than it does with me." In his written report, he wrote that if "the client [had] been discovered earlier, brain damage developing over time could have been ameliorated *in ways that physicians know and can describe.*" (Emphasis added.)

"[I]t has long been settled that the qualification of an expert witness is largely within the discretion of the trial court, and is not usually the subject to appellate review." *Gertner v. Newrath*, 49 A.2d 655, 656 (D.C.1946). More recently, the en banc court elaborated on the point:

"The trial judge has wide latitude in the admission or exclusion of expert testimony, and his decision with respect thereto should be sustained unless it is manifestly erroneous." *Coates v. United States*, 558 A.2d 1148, 1152 (D.C.1989). The question whether an expert has been sufficiently qualified is likewise "recognized as a matter for the trial judge's discretion reviewable only for abuse. *Reversals for abuse are rare.*" E. CLEARY, MCCORMICK ON EVIDENCE § 13, at 34 (3d ed.1984).

*In re Melton*, 597 A.2d 892, 897 (D.C.1991) (en banc) (emphasis in original; footnote omitted).

The trial judge exercised his discretion judiciously in excluding Dr. Smothers' evidence, and there was no error.