**PRESIDENT and DIRECTORS OF GEORGETOWN COLLEGE, et al., Appellants,**

v.

**Crystal WHEELER, Appellee.**

**Nos. 12–CV–671, 12–CV–672.**

District of Columbia Court of Appeals.

Argued May 7, 2013.
Decided Sept. 19, 2013.

James P. Gleason, Jr., with whom Joanna Jesperson, Washington, DC, was on the brief, for appellants, President and Directors of Georgetown College.

Steven A. Hamilton, with whom Karen S. Karlin and Matthew D. Banks, Bethesda, MD, were on the brief for appellant, Dr. Marilyn McPherson–Corder.

Melissa Rhea, with whom Sandra H. Robinson, Harlow R. Case, and Jack H. Olender, Washington, DC, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, BLACKBURNE–RISGBY, Associate Judge, and BELSON, Senior Judge.

BELSON, Senior Judge:

This is an appeal by a hospital and a physician from a large judgment against them in a medical malpractice case. Appellee Crystal Wheeler suffered various medical complications as the result of a Rathke's cleft cyst behind her left eye, which went undetected for nearly ten years despite its appearance on a 1996 MRI report. Wheeler brought a medical-malpractice suit against the appellants, Marilyn McPherson–Corder, M.D., and the President and Directors of Georgetown College ("Georgetown"), claiming that their negligence caused the cyst to go undiscovered. Following a lengthy trial in Superior Court, a jury awarded Wheeler more than $2.5 million in damages. Dr. McPherson–Corder and Georgetown now appeal, making four arguments: (1) the jury's verdict was irreconcilably inconsistent, in that it found that the appellants' negligent failure to detect the cyst was a proximate cause of Wheeler's injuries, but also found that Wheeler's own failure to follow up on the 1996 MRI report, while negligent, was not a proximate cause; (2) the trial court erred by admitting Wheeler's proffered expert testimony, as her experts' conclusion that her cyst caused certain gastrointestinal problems has not been generally accepted in the medical scientific community; (3) Wheeler's counsel made improper and prejudicial statements during her closing argument; and (4) the jury's verdict was against the weight of the evidence.

We reject the appellants' first argument because they waived their objection to any alleged inconsistency by failing to raise the issue before the jury's dismissal. We find their second argument lacking, as it misstates our standard for the admission of expert testimony. We likewise find their third argument unpersuasive, as we see no impropriety in Wheeler's counsel's remarks. We do, however, find merit in one aspect of appellant's argument on the weight of the evidence, i.e., insofar as it relates to the jury's award of greater future medical costs than the evidence established. Because the jury awarded $19,450

more than the record supports, we remand with instructions that the trial court amend its order to reduce the award in that amount. In all other respects, we affirm.

## I.

Wheeler has long suffered from a litany of health problems, including serious gastrointestinal difficulties. At several times in her youth, she was hospitalized due to extreme nausea and vomiting. These problems persisted throughout her adolescence, and have lasted well into her adult life.

In 1996, Wheeler began attending college in southern Virginia. When she returned home to Washington, D.C., the following summer, she complained of severe headaches to her then-pediatrician, Dr. Marilyn McPherson–Corder. Accordingly, Dr. McPherson–Corder referred her to a Georgetown University Hospital pediatric neurologist, Dr. Yuval Shafrir.

Dr. Shafrir saw Wheeler twice that summer, once on July 8, and again on August 5. During the first visit, Wheeler was also experiencing leg and ear pain. Because of these other maladies, Dr. Shafrir was unable to fully diagnose her headaches. He prescribed medication for her ear pain, which he concluded was the result of an ear infection, and asked her to come back in a few weeks when her symptoms cleared. When she returned, Dr. Shafrir diagnosed her headaches as migraines. Accordingly, he instructed her on migraine management, prescribed medication, and asked her to keep a headache diary. He also noticed "a new complete blurring of [Wheeler's] right optic disk," which prompted him to give her a prescription and tell her to arrange an EKG and an MRI through her primary-care physician.

The parties dispute exactly what Dr. Shafrir told Wheeler about these tests. At trial, Wheeler testified that Dr. Shafrir told her that both procedures were merely "precautionary," and that he would contact her if there were "any concerns with the MRI." Dr. Shafrir, however, testified that while he does not have any independent memory of Wheeler's visits, he "always" told patients to contact him within three days of having an MRI if they did not hear from him. He also testified that whenever he ordered an MRI he would instruct the patient to come back for a follow-up visit. He said that this system, which placed the onus on the patient to follow up on test results, had "never" failed him. He testified that it would be "impossible" for him to track down every result independently, in light of the system he used for having patients get an MRI.

After Wheeler's second visit, Dr. Shafrir wrote to Dr. McPherson–Corder, informing her that he asked Wheeler to undergo an MRI and EKG. Although he indicated that he had already received the EKG results, which came back "normal," he did not mention any MRI results. He also wrote that he would "like to see [Wheeler] again in my office during her next college vacation."

Wheeler obtained a referral for the MRI from Dr. McPherson–Corder's office. She then had the MRI performed at Georgetown Hospital on August 16. This MRI revealed a 3–5 mm supersellar cyst behind her left eye—likely a Rathke's pouch cyst. At the time, the cyst was not pressuring her pituitary gland, hypothalamus, or her optic chiasm. Neither Dr. McPherson–Corder nor Dr. Shafrir ever saw the results of this MRI during the time relevant to this proceeding.

Wheeler's gastrointestinal issues troubled her throughout college. She continued to struggle with nausea, vomiting, and low appetite. After her graduation in 2000,

her symptoms only worsened. She began losing weight, required at least four gastric-emptying procedures, and on several occasions had to be hospitalized. Eventually, her condition deteriorated to the point that her doctors were forced to insert a feeding tube. In 2003, she was diagnosed with gastroparesis: a condition that makes it more difficult for the stomach to empty properly.

Wheeler's physical decline correlated with her deteriorating mental health. In 2002, she reported increasing depression and stress, which she attributed to her physical maladies. In 2003, her depression worsened, and she began to suffer from panic attacks. She was diagnosed with depressive disorder in 2004 and major depression in 2005. She was also diagnosed with a mood disorder.

Her medical problems came to a head when, in December 2005, she checked into George Washington University Hospital ("GWU") complaining of vertigo and double vision. At that time, GWU doctors ordered an MRI. Like the 1996 MRI, this new test showed a cyst-like mass behind Wheeler's left eye. The cyst had visibly grown, now measuring approximately 11 × 8.5 × 10 mm, and was causing "mass effects" on Wheeler's optic chiasm. Also at this time, GWU doctors diagnosed Wheeler with thyroid and adrenal deficiencies, as well as abnormally low levels of human growth hormone.

After her discharge from GWU Hospital, Wheeler saw Dr. Walter Jean, a neurosurgeon at Georgetown University Hospital. Dr. Jean asked Wheeler to undergo another MRI. While examining the results of this MRI in March 2006, Dr. Jean discovered the 1996 MRI. Comparing the two MRIs, he noted that Wheeler's cyst had

"progress[ed]" during the intervening decade, becoming "bigger." Dr. Jean then performed surgery to remove the cyst, without complication.

Wheeler brought suit against Georgetown [1] and Dr. McPherson–Corder on November 24, 2008. Over the course of a thirteen-day trial, both sides called several competing medical experts. Through her experts, Wheeler sought to establish that the cyst caused or contributed to her hormone deficiencies, gastroparesis, and mental-health issues. Her experts testified that, had the cyst been detected and removed earlier, she would have avoided these problems. The appellants' experts vigorously disputed any such causal connection. The appellants also disputed Wheeler's claim that Drs. McPherson–Corder and Shafrir breached their respective duties of care, argued that the doctors' actions did not cause Wheeler's injuries, and contested the extent of her damages. In addition, they maintained that, because Wheeler failed to follow up on the MRI results herself, she was contributorily negligent.

The jury ultimately returned a verdict in Wheeler's favor. It found that the doctors breached their respective standards of care and that their breaches proximately caused Wheeler's injuries. It also found that Wheeler was "contributorily negligent" for not "following Dr. Shafrir's instructions to follow up with him after obtaining the MRI." However, it concluded that her negligence was not a proximate cause of her injuries. It awarded her $505,450.37 in past medical expenses, $800,000 in future medical expenses, and $1,200,000 in noneconomic damages, for a

---

1. Wheeler's claim against Georgetown was based on its *respondeat superior* liability for Dr. Shafrir's alleged negligence.

total of $2,505,450.37.[2]

Following trial, Georgetown and Dr. McPherson–Corder moved jointly for judgment notwithstanding the verdict, or in the alternative for a new trial. In support of this motion, they presented four arguments. First, they claimed that the jury could not rationally have concluded that the negligence of each of the physicians was a proximate cause of Wheeler's injuries, but that her own negligent failure to follow up with Dr. Shafrir was not. Therefore, they argued, the jury's verdict was irreconcilably inconsistent. Second, they asserted that there was no general acceptance in the medical scientific community of a causal connection between Rathke's cleft cysts and gastroparesis. Accordingly, Wheeler's expert testimony on that point had been inadmissible under *Dyas v. United States*, 376 A.2d 827 (D.C.1977), and *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923). Third, they claimed that the jury's verdict was against the weight of the evidence. Fourth and finally, they argued that Wheelers' attorney improperly appealed to the jury's passions during her closing argument.

The trial court denied their motion on April 27, 2012. This appeal followed.

## II.

On appeal, Georgetown and Dr. McPherson–Corder reiterate the arguments they presented in their post-trial motion. We address these arguments in turn, beginning with their claim that the verdict was irreconcilably inconsistent.

### (a)

Georgetown and Dr. McPherson–Corder's first argument on appeal is essentially the same one they made to the trial court: that the jury could not rationally have concluded that their negligent conduct was a proximate cause of Wheeler's injuries, but that the contributory negligence it found Wheeler had committed was not a proximate cause. The trial court rejected this argument, finding that the verdict was not irreconcilable. We now affirm, but on alternate grounds. We do not reach the question of whether the verdict was irre-

---

2. The verdict form's first three questions, and the jury's answers to them, read:

 **VERDICT FORM**

 1(a). Did Yuval Shafrir, M.D., as agent and employee of Georgetown University Hospital, breach the standard of care in his care and treatment of Crystal Wheeler? Yes *x*; No____.

 1(b). Did Marilyn McPherson–Corder, M.D. breach the standard of care in her care and treatment of Crystal Wheeler? Yes *x*; No____.

 **If you answered "NO" to *BOTH* Questions # 1(a) and # 1(b), *STOP ANSWERING QUESTIONS HERE*. THE FOREPERSON SHOULD SIGN AND DATE THIS FORM, AND NOTIFY THE JUDGE.**

 **If you answered "YES" to Question # 1(a), please answer Question # 2(a).**

 **If you answered "YES" to Question # 1(b), please answer Question # 2(b).**

 2(a). Was the breach of the standard of care by Yuval Shafrir, M.D., as agent and employee of defendant Georgetown University Hospital, a proximate cause of injuries and damages to Crystal Wheeler? Yes *x*; No____.

 2(b). Was the breach of the standard of care by Marilyn McPherson–Corder, M.D. a proximate cause of injuries and damages to Crystal Wheeler? Yes *x*; No____.

 **If you answered "NO" to Questions # 2(a) and # 2(b), *STOP ANSWERING QUESTIONS HERE*. THE FOREPERSON SHOULD SIGN AND DATE THIS FORM, AND NOTIFY THE JUDGE.**

 **If you answered "YES" to Question # 2(a) or # 2(b), please proceed to Question # 3.**

 3(a). Was Crystal Wheeler contributorily negligent in not following Dr. Shafrir's instructions to follow up with him after obtaining the MRI? Yes *x*; No____.

 * * * *

 3(b). Was Crystal Wheeler's negligence a proximate cause of her injuries and damages? Yes____; No *x*.

concilably inconsistent. Rather, we conclude that the appellants waived their objection by failing to raise the issue before the jury's discharge.

■ In general, a civil jury will return one of three types of verdicts. In many cases, this will be a standard general verdict. A general verdict is " '[a] verdict by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions.' " *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1201 (11th Cir.2004) (quoting *Mason v. Ford Motor Co.*, 307 F.3d 1271, 1274 (11th Cir.2002)); *accord* BLACK'S LAW DICTIONARY 1696 (9th ed. 2009). The jury will also set damages, where appropriate. *See Mason, supra,* 307 F.3d at 1273. When the jury returns such a verdict, the basis for its decision is usually not stated explicitly; the jury simply announces a decision for one side or the other. *See Robinson v. Washington Internal Med. Assocs., P.C.,* 647 A.2d 1140, 1144 (D.C.1994) ("Because the jury returned a general verdict in favor of the defendants, we do not know whether the jury found that the defendants were not negligent (or that proximate causation was not proven) or that the plaintiff was contributorily negligent."); *see also Sinai v. Polinger Co.,* 498 A.2d 520, 523 n. 1 (D.C. 1985).

■ In addition, Superior Court Civil Rule 49 [3] authorizes trial courts to use two alternate verdict types. First, subsection (a) permits the trial court to submit to the jury "a special verdict in the form of a special written finding upon each issue of fact." When returning such a "special verdict," the jury answers only the specific factual questions posed by the court. *Trull v. Volkswagen of Am., Inc.,* 320 F.3d

---

**3.** In full, the rule states:

(a) **Special Verdicts.** The Court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the Court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The Court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the Court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the Court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict. (b) **General Verdict Accompanied by Answer to Interrogatories.** The Court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon 1 or more issues of fact the decision of which is necessary to a verdict. The Court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but 1 or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the Court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and 1 or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the Court shall return the jury for further consideration of its answers and verdict or shall order a new trial.
Super. Ct. Civ. R. 49.

1, 4 (1st Cir.2002) (describing special verdicts under the corresponding Fed. R.Civ.P. 49(a) as setting forth "written finding[s] upon each issue of fact"); *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1519 (6th Cir.1990) ("A special verdict is one in which the jury finds *all* the facts and then refers the case to the court for a decision on those facts." (citation omitted)). Indeed, "[w]ith a special verdict, the jury's sole function is to determine the facts; the jury needs no instruction on the law because the court applies the law to the facts as found by the jury." *Mason, supra,* 307 F.3d at 1274.

Second, subsection (b) authorizes the court to "submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon [one] or more issues of fact the decision of which is necessary to a verdict." Verdicts submitted under this section are "hybrid[s]" between standard general verdicts and special verdicts. *Mason, supra,* 307 F.3d at 1274; *see also Portage II, supra,* 899 F.2d at 1520 ("The general verdict with interrogatories may be viewed as a middle ground between the special verdict and the gener-

al verdict. . . ."). They "permit[ ] a jury to make written findings of fact and to enter a general verdict," *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 53 (2d Cir.1992), and are useful when it is necessary to determine "specifically what the jury found." *Sinai, supra,* 498 A.2d at 533 (Nebeker, J., concurring).

■ The distinction between these verdict types is crucial in this case, because a party waives its objection to any alleged inconsistency in a general verdict, with or without interrogatories, if it fails to object before the jury's discharge. *See District of Columbia Hous. Auth., v. Pinkney,* 970 A.2d 854, 868 (D.C.2009) ("DCHA did not raise an objection based on inconsistent verdicts before the jury was excused, [after returning general verdict with special interrogatory,] and it therefore has waived this argument."); *Estate of Underwood v. Nat'l Credit Union Admin.,* 665 A.2d 621, 645 (D.C.1995) (explaining that Rule 49, "particularly section (b), countenances a waiver of objections to inconsistencies in the verdict that are not pointed out before the jury is discharged").[4] That rule, however, may not apply to special verdicts.

4. Federal courts widely follow the same practice under Federal Rule 49. *See, e.g., Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 727 (6th Cir.2012) ("[A] party waives its objection to an inconsistent verdict under Civil Rule 49, when it does not object before the court discharges the jury." (citing *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 618–19 (6th Cir.2007))); *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1419 (11th Cir.2011) ("We have held that if the party challenging this type of verdict has failed to object before the jury is discharged, that party has waived the right to contest the verdicts on the basis of alleged inconsistency." (quotation marks omitted)); *Chem–Trend, Inc. v. Newport Indus., Inc.*, 279 F.3d 625, 629 (8th Cir.2002) (holding that the appellant "waived ... [its] challenge by failing to object before the district court discharged the jury"); *Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 63 (1st Cir. 2002) ("We have held that under Rule 49(b),

objections to the inconsistency of verdicts must be made after the verdict is read and before the jury is discharged." (citing cases)); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 726 (4th Cir.1999) ("[A] litigant's failure to raise an inconsistency before the jury is discharged renders Rule 49(b) inapplicable and thus precludes that litigant from relying upon the inconsistency to challenge an adverse disposition."); *Bonin v. Tour West, Inc.*, 896 F.2d 1260, 1263 (10th Cir.1990) ("If a party fails to object before the jury is discharged, he waives any future challenge to the inconsistency because his failure to make a timely objection deprives the court of the option of sending the jury back for further deliberations."). *Cf. Hundley v. District of Columbia,* 377 U.S.App.D.C. 451, 494 F.3d 1097, 1103 (2007) (holding that the plaintiff did not waive its inconsistency objection because it "repeatedly objected at trial to the proposed written interrogatory").

*See Mason, supra,* 307 F.3d at 1274 ("[I]f the jury rendered inconsistent general verdicts, failure to object timely waives that inconsistency as a basis for seeking retrial; inconsistent special verdicts, on the other hand, may support a motion for a new trial even if no objection was made before the jury was discharged.").[5]

In this case, the verdict form itself did not specify the type of verdict to be rendered. That form, labeled simply "Verdict," first directed the jurors to determine whether Dr. Shafrir or Dr. McPherson–Corder breached the applicable standards of care in his or her care of and treatment of Wheeler. If the jurors answered either question with a "yes," the form instructed them to determine whether the breach by either or both doctors was a proximate cause of injuries and damages to Wheeler. If the jurors answered "yes" again, the form instructed them to then determine whether Wheeler was "contributorily negligent in not following Dr. Shafrir's instructions to follow up with him after obtaining the MRI." Then, if the jurors found that she was, the form required them to determine whether Wheeler's "negligence [was] a proximate cause of her injuries and damages."[6] The form also called on the jurors to consider the appellants' assumption-of-the-risk defense. Finally, if the jurors ultimately found in Wheeler's favor, the form required them to award damages.

The verdict form used in this case did not call for a general verdict of the most basic type. In the past, however, we have at times referred to similar verdicts as general. *See Nimetz v. Cappadona,* 596 A.2d 603, 606 (D.C.1991) (describing as "general" a verdict form that "require[ed] the jury to make separate findings only on

5. In *Mason,* the Eleventh Circuit noted an apparent "conflict" among the federal courts as to whether a party also waives its objection to inconsistent special verdicts by not raising the objection before the jury is discharged. *Supra,* 307 F.3d at 1274 n. 4. *Compare Fugitt v. Jones,* 549 F.2d 1001, 1005 (5th Cir.1977) (considering inconsistent-verdict argument despite party's failure to object before the jury's discharge), *with Jacobs v. City of Philadelphia,* 212 Fed.Appx. 68, 71 (3d Cir.2006) (holding that appellant waived objection to inconsistent special verdict "because he raised no such objection before the jury was excused"), *and Lavoie, supra,* 975 F.2d at 54 (holding that party waived its objection to inconsistent special verdict by not raising it, even though it had "ample opportunity ... and the course of the trial proceedings put it on notice that an inconsistency might arise"), *and Golub v. J.W. Gant & Assocs.,* 863 F.2d 1516, 1521 (11th Cir.1989) ("Objections to the *form* of interrogatories in a special verdict must be raised before the jury is charged. Otherwise, they are waived." (emphasis added) (internal citations omitted)). But like the *Mason* court, we need not address that conflict, because we find *infra* that the verdict in this case was not a special verdict.

6. The appellants do not argue that the verdict form was facially inconsistent because it allowed the jury to reach different conclusions as to Wheeler's "contributory negligence," a concept which ordinarily encompasses negligence and proximate cause. Indeed, it is not clear they could do so, given that appellants' counsel took primary responsibility for drafting the verdict form. *See Preacher v. United States,* 934 A.2d 363, 368 (D.C.2007) ("Generally, the invited error doctrine precludes a party from asserting as error on appeal a course that he or she has induced the trial court to take.").

Appellants could have avoided any potential confusion on this point by simply phrasing the verdict form to ask only whether Wheeler had been negligent by failing to follow Dr. Shafrir's instructions (as opposed to *contributorily* negligent), and whether her negligence was a proximate cause of her injuries. Such phrasing would have tracked the language of the applicable Standardized Instructions. *See* Standardized Civil Jury Instructions for the District of Columbia, No. 5–15 (2013 rev. ed.) ("The defendant alleges that the plaintiff was negligent. The defendant is not liable for the plaintiff's injuries if the plaintiff's own negligence is a proximate cause of [his] [her] injuries.").

negligence, proximate cause, and the award of damages for each plaintiff"). *Accord Portage II, supra,* 899 F.2d at 1518, 1522 (construing as "general" a verdict form that asked the jury whether the defendant was negligent and whether the plaintiff was contributorily negligent); *Pinkney, supra,* 970 A.2d at 868–69 (holding that appellant waived its objection to inconsistency in remarkably similar verdict by failing to raise it before jury's discharge). Nevertheless, this verdict does not comfortably fit the accepted definition of a "general" verdict, because it required the jurors to expressly resolve at least one discrete factual issue: whether Wheeler "follow[ed] Dr. Shafrir's instructions to follow up with him after obtaining the MRI." *See, e.g., Wilbur, supra,* 393 F.3d at 1201. Thus, although this verdict form was similar to others we have called "general," it was not a general verdict in its most basic form.

But it is likewise unclear that the form called for a Rule 49(b) general verdict with interrogatories. True, one portion of the form suggests such a verdict, because, as noted above, the jury answered at least one question regarding a discrete factual issue (i.e., whether Wheeler failed to follow Dr. Shafrir's instructions), while still deciding the ultimate issue of liability. *See Portage II, supra,* 899 F.2d at 1521 (holding that verdict form that asked jury several factual questions, but also required it to determine ultimate liability, called for a general verdict with interrogatories). But the trial court here did not indicate that it was exercising its authority under Rule 49(b). Rather, it used a form simply labeled "Verdict." And that form did not pose any purely factual questions. Instead, each question required the jury to resolve both factual questions and legal issues. *But cf. Lavoie, supra,* 975 F.2d at 54 (finding verdict form was a general

verdict with interrogatories despite the "unusual nature" of the form used).

 The issues before us, however, do not require us to choose between labeling this verdict a general verdict or a Rule 49(b) general verdict with interrogatories, because we can clearly determine that it was not a special verdict—the only type of verdict to which a party might be permitted to raise an inconsistency objection after the jury's discharge. Special verdicts do not require the jury to determine ultimate liability, or indeed reach any legal conclusions whatsoever. *Mason, supra,* 307 F.3d at 1274 ("[A] Rule 49(a) special verdict is a verdict by which the jury finds the facts particularly, and then submits to the court the questions of law arising on them." (internal quotation marks omitted)). Indeed, when a trial court uses a special-verdict form, it generally will not instruct the jury on the law at all, because the jury will not be called upon to apply the law. *See Bills v. Aseltine,* 52 F.3d 596, 605 (6th Cir.1995) (holding that verdict was general where the jury instructions "discussed legal matters in detail"); *Portage II, supra,* 899 F.2d at 1521. In other words, when rendering a special verdict, the jury *only* finds specific facts. BLACK'S LAW DICTIONARY 1697 (9th ed. 2009) (defining "special verdict" as "[a] verdict in which the jury makes findings *only* on factual issues submitted to them by the judge" (emphasis added)).

But here, the jury did much more. Not only did the jury determine ultimate liability, it explicitly resolved several mixed legal and factual issues along the way, including negligence, proximate cause, and assumption of the risk. *Cf. Jarvis v. Ford Motor Co.,* 283 F.3d 33, 56 (2d Cir.2002) (holding that Federal Rule 49(a), governing special verdicts, does not apply when "the jury is required to make determinations not only of issues of fact but of

ultimate liability"). Recognizing that the jury would be applying law to facts, the trial court thoroughly instructed it on the applicable legal principles. *Cf. Portage II, supra,* 899 F.2d at 1521 ("If the written questions submitted to the jury were truly special verdicts, no instruction on the law, and certainly not one as detailed would have been given to the jury."). With these facts in mind, we can comfortably conclude that, whatever type of verdict this was, it was not a special verdict.

Accordingly, because the verdict was not special, it was either a standard general verdict or a Rule 49(b) general verdict with interrogatories. To preserve an objection to an alleged inconsistency in either of these types, a party must raise the argument before the jury is discharged. Here, appellants failed to do so. Accordingly, they waived their objection to any inconsistency in the verdict. *See, e.g., Underwood, supra,* 665 A.2d at 645; *Pinkney, supra,* 970 A.2d at 868.

### III.

■ The appellants next argue that the trial court erred by permitting Wheeler's expert witnesses to testify that there was a causal link between her Rathke's cleft cyst and her gastroparesis. They assert that Wheeler failed to demonstrate that such a causal relationship is generally accepted in the medical scientific community.

■ In general, "[t]he trial court has broad discretion to admit or exclude expert testimony." *Russell v. United States,* 17 A.3d 581, 585 (D.C.2011). But this discretion is not unlimited. Before permitting expert testimony, the trial court must determine that the proffered testimony meets three threshold requirements:

(1) the subject matter must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman; (2) the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth; and (3) expert testimony is inadmissible if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.

*Id.* at 586 (quoting *Dyas v. United States,* 376 A.2d 827, 832 (D.C.1977)) (original emphasis omitted) (internal quotation marks omitted). Here, appellants acknowledge that Wheeler's experts satisfied the first two requirements. They argue only that the experts' testimony failed to meet the third requirement: that the "state of the pertinent art or scientific knowledge" permits the expert to state "a reasonable opinion." Specifically, they claim that "Wheeler's experts were required to demonstrate that the medical community recognizes and supports their conclusion that there is a causal link between a Rathke's cleft cyst and gastroparesis or hormonal insufficiency and gastroparesis."

■ This argument misstates our admissibility standard. The third *Dyas* requirement focuses not on " 'the acceptance of a particular . . . conclusion derived from [the] methodology,' " but rather on "the acceptance of the methodology itself." *Minor v. United States,* 57 A.3d 406, 420–21 (D.C.2012) (quoting *United States v. Jenkins,* 887 A.2d 1013, 1022 (D.C.2005)). In other words, "satisfaction of the third *Dyas* criterion begins—and ends—with a determination of whether there is general acceptance of a particular scientific methodology, not an acceptance, beyond that, of particular study results based on that methodology." *Burgess v. United States,* 953 A.2d 1055, 1063 n. 12 (D.C.2008) (quot-

ing *Ibn–Tamas v. United States*, 407 A.2d 626, 638 (D.C.1979)).

Here, the appellants challenge Wheeler's experts' "conclusion[s]," not their methodology. This challenge fails, because it "focuse[s] on the wrong question." *Minor, supra*, 57 A.3d at 420. At trial, Wheeler's experts testified that they based their conclusions on case studies and medical literature, which listed endocrine conditions like hypothyroidism as a cause of gastroparesis.[7] The appellants contested these conclusions during trial, and do so again on appeal. But they have offered no argument that reliance on relevant medical literature, which according to at least one expert dates back to the 1970s, as well as case studies appearing in that literature, is not a "generally accepted" method for forming an opinion regarding medical causation. Accordingly, we find the appellants' challenge unpersuasive.[8]

## IV.

 Next, the appellants argue that the trial court should have ordered a new trial based on certain comments Wheeler's counsel made during closing arguments. Specifically, they point to counsel's statements regarding the applicable standard of care, which they characterize as an improper send-a-message argument:

> You know, the jury system in our country exists to protect the community. And in this medical malpractice case, you will decide what standards doctors must meet in the community when they provide care and treatment to patients.

> You will decide what standards doctors must meet to protect patient health and safety.... Remember, the standards ... in the medical community exist for a reason. They have been developed by doctors for doctors. They exist to promote patient safety. They exist to protect patient health. They're to provide a medical care system that above all prevents harm that's avoidable. And what these standards are in this community is what you will be deciding when you go back to the jury room.

This court will reverse on the basis of improper comments by counsel only when it is likely that the comments left " 'the jurors with wrong or erroneous impressions, which were likely to mislead, improperly influence, or prejudice them to the disadvantage of the [defendant].' " *Psychiatric Inst. of Wash. v. Allen*, 509 A.2d 619, 629 (D.C.1986) (quoting *Simpson v. Stein*, 52 App.D.C. 137, 139, 284 F. 731, 733 (1922)). Because it has the advantage of observing the arguments as they occurred, the trial court is in a better position than this court to determine whether counsel's statements were prejudicial. *Scott v. Crestar Fin. Corp.*, 928 A.2d 680, 690 (D.C.2007). Accordingly, we afford the trial court's conclusions on that count broad deference, and will sustain its ruling so long as it is "rational." *Id.*

Here, the trial court concluded that counsel's statements "related to the determination the jury was being asked to make regarding the standard of care," and found "no impropriety in the closing argument."

---

7. Specifically, Dr. Stuart Finkel testified that, based on his knowledge, education, experience, and familiarity with the medical literature on gastroparesis, roughly 20 percent of cases like Wheeler's are cause by endocrine disorders, such as hypothyroidism. Dr. Michael Cooperman testified that he based his own conclusions on two case studies, which he considered similar to Wheeler's case.

8. Even if it were appropriate for the appellants to challenge the general acceptance of Wheeler's experts' conclusions, the appellants would have difficulty doing so, given that their own experts admitted that hypothyroidism is a known cause of gastroparesis.

Based on our own reading of counsel's comments, we conclude that the trial court's conclusion was "rational." *Id.* Counsel merely explained the jury's role in determining the applicable standard of care. She did not urge the jury to penalize the appellants based on irrelevant considerations or to return a verdict that would "send a message." Accordingly, we will defer to the trial court's judgment.

## V.

 Finally, the appellants argue that the verdict was against the weight of the evidence. Although their argument is multi-faceted,[9] we focus in particular on their claim that the evidence did not support the jury's award of $800,000 in future medical costs. Specifically, the appellants argue that the jury awarded $19,450 more than Wheeler's damages expert testified was necessary, and that this additional award was based on pure speculation. We agree.

 In general, we do not require plaintiffs to prove their damages " 'precisely' " or " 'with mathematical certainty.' " *District of Columbia v. Howell*, 607 A.2d 501, 506 (D.C.1992) (quoting *Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C.1991)). Nevertheless, plaintiffs must provide " 'some reasonable basis upon which to estimate damages.' " *Id.* The jury may not award damages based solely on speculation. *Zoerb v. Barton Protective Servs.*, 851 A.2d 465, 470 (D.C.2004). Specifically in the context of future-medical-expenses

awards, we have held that where there is "no basis upon which the jury could have reasonably calculated or inferred the cost of [the plaintiff's] future medical expenses," the trial court may not "allow the jury to speculate in this area of damages." *Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C.1982).

Here, Wheeler's damages expert, economist Dr. Richard Lurito, testified that a lump-sum payment of $780,550 would fully compensate Wheeler for her future medical costs. He reached this figure by looking at historical trends, projected treatment costs, and estimated inflation in the general economy. He testified that he used a 3.75% after-tax discount rate, which he described as "reasonable and conservative." He adopted this rate based on current market conditions, accounting for current returns on short-and long-term government bonds, and adjusting for relatively low present interest rates. Then, during closing arguments, Wheeler's counsel urged the jury to award Wheeler $780,550—the full amount Dr. Lurito recommended. But the jury was ultimately more generous, rounding Dr. Lurito's figure up and awarding Wheeler $800,000 for future medical expenses—a sum $19,450 in excess of the amount Dr. Lurito indicated was necessary.

Wheeler points us to no record evidence upon which the jury could have reasonably awarded this additional $19,450, nor can we discern any. Wheeler argues that the jury could have inferred that a larger sum would be necessary based on Dr. Lurito's

9. The appellants also make a broader weight-of-the-evidence argument, contending that the jury could not rationally have credited Wheeler's experts over their own. We do not think it necessary to restate the particulars of that argument here. We note only that it would not be proper for this court to usurp the jury's factfinding role by reweighing the evidence in a manner more to the appellants' liking. "When the case turns on disputed factual

issues and credibility determinations, the case is for the jury to decide." *Durphy v. Kaiser Found. Health Plan of Mid–Atlantic States, Inc.*, 698 A.2d 459, 465 (D.C.1997); *see also Burke v. Scaggs*, 867 A.2d 213, 217 (D.C.2005) (holding that judgment as a matter of law is permissible "only if it is clear that the plaintiff has not established a *prima facie* case" (quoting *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1097 (D.C.1994))).

description of his estimate as "conservative." But there was no basis in the evidence for the jury to make such an inference. Although Dr. Lurito described in detail the factors he considered in his calculations, he did not testify what a more pessimistic forecast would have entailed, nor did he indicate how much additional money would be necessary under less-favorable circumstances. Accordingly, the jury could only speculate that Wheeler might require an extra $19,450 to cover her medical costs. *Cf. Zoerb, supra,* 851 A.2d at 471 ("[E]ven if we were to conclude—which we do not—that generalizations such as 'the sooner the better,' without evidence as to how much sooner was how much better, were sufficient to preclude the direction of a verdict as to liability, the jury would face an impossible task in attempting to make a rational award of damages.").

The jury is not permitted to award damages based on such speculation. *See Rom-* *er, supra,* 449 A.2d at 1100. Because the award of an additional $19,450 was not supported by the evidence, the trial court should have granted a remittitur in that amount. *See Duff v. Werner Enters., Inc.,* 489 F.3d 727, 730–31 (5th Cir.2007) (ordering trial court to grant remittitur where future-medical-costs award exceeded "the 'maximum amount calculable from the evidence'" (quoting *Carlton v. H.C. Price Co.,* 640 F.2d 573, 578 (5th Cir.1981))). Accordingly, we remand with instructions for the trial court to amend its order, reducing the future-medical-expenses award by $19,450 to accord with the evidence.

*So ordered.*